W. C. Statham et al. *v.* New York Life Insurance Company et al.

1. Attachments in chancery — when they lie. — The basis of the jurisdiction of the chancery courts to maintain attachment under art. 60, p. 549, Rev. Code, 1857, is purely statutory, and depends on the condition of facts stated in the statute, to wit, the absence of the debtor; the presence of effects here belonging to, or a debt due to him; or his owning lands and tenements in this state.

2. Life insurance — agency — effect of war on agency. — Where, at the opening of the war, a life insurance company of New York had an agent in Mississippi, who remained during the war, the war did not, *per se*, revoke the agency, nor make it unlawful for the agent to receive premiums which were tendered. A payment to him would have been a discharge of the debt, and a tender to him of the annual premium due 8th December, 1861, saved the assured from being in default as to payment of premiums.

3. Same — effect of war on contract of insurance. — Unless for their completion, it be necessary that some act be done, calculated to lend aid and comfort to the enemy, partly executed contracts, as life insurance policies, on which the premiums have, up to the war, been regularly paid, are not annulled by the war, but are suspended until its conclusion.

4. Agencies of foreign insurance companies in this state — effect of our statutes. — Foreign insurance companies, dealing with our citizens under Revised Code of 1857, p. 303, § 11, must be considered as engaging to accept performance from the assured here, and on their part to pay losses here.

5. Equity pleading — exhibits form no part of bill on demurrer. — Exhibits cannot be looked to, either to aid a defective and insufficient statement of the title to relief and discovery, or as taking away and defeating such right.

Error to the chancery court of Hinds county. Watts, J.

The facts appear in the opinion of the court. The process, by which the funds of the company in this state were

seized, was a writ of attachment and sequestration, issued from the chancery court.

*W. & J. R. Yerger*, for plaintiffs in error.

The several causes of demurrer assigned may all be considered under two heads, viz. : 1st. The complainant had an adequate remedy at law. 2d. Complainant forfeited all right to the amount of the policy by the non-payment of the premium, due on the 8th of December, 1867, and the excuse set up in the bill is not sufficient to induce a court of equity to relieve against a forfeiture.

In answer to the first cause of demurrer, it is sufficient to state that this is an attachment in chancery, begun by a resident complainant, to reach assets belonging to a non-resident debtor in the hands of resident defendants. The direct question here presented was made in the case of Freeman v. Guion et al., 11 Smedes & Marsh. 58, and the jurisdiction in an attachment suit in equity on legal demands by resident creditors, against non-resident debtors was fully sustained. This case was decided in 1848, and arose under the act of June 7, 1822. The provisions in the Rev. Code of 1857, relative to attachments in chancery against non-resident debtors, contains the same provisions as the act of 1822, and must be considered as having been adopted with the construction placed by the court upon the act of 1822. The cases of Comstock v. Rayford, 1 Smedes & Marsh. 423, and Zacharie v. Bowers, 3 ib. 641, and Freeman v. Malcolm, 11 ib. 53, cannot be distinguished in principle from the case of Freeman v. Guion. The jurisdiction in chancery by attachment in a similar statute was maintained in Virginia. 3 Mumf. 94 ; 7 Cranch, 202 ; 3 Leigh, 300 ; 10 ib. 507 ; 12 ib. 406 ; 2 Rob. (Va.) 206. The jurisdiction to proceed by attachment in chancery in the case presented by the bill, if the demand were purely legal, is placed beyond doubt by the case in 11 Smedes & Marsh. 58, which was fully considered by the court, and has never been modified, but sustained in

the case of McKay v. Cobb & Manlove, 33 Miss. 533. Opposing counsel cite and rely on Judge Sharkey's dissenting opinion in this case. In reply to this, I need only refer to the opinion of Judge Sharkey, himself, in Planters' Bank v. Sharp, 4 Smedes & Marsh. 83, in which he states that the law is to be taken as established by the opinion of the majority of the court, and not by the dissenting opinion. But the jurisdiction of the court of equity is applicable in every case where the remedy at law is not plain, adequate and unembarrassed. Although, on the facts presented by the bill, it might be that a court of law would take jurisdiction ; yet, the remedy was not plain and unembarrassed. Payment of the premium due in December, 1861, had not been made in fact. It is true that an offer to pay it was made to the party who had acted as agent of the insurance company before the war. But that agent had declined to receive the payment upon the ground that it would be unlawful in him to do so. Whether, at law, such an offer to pay would be held equivalent to payment, and thus relieve the complainants from the effect of a forfeiture, was not free from doubt. That such an offer, coupled with the other facts, would relieve in equity there seemed to be no doubt. It was a clear case for a court of chancery to exercise one of its original, inherent powers, which is to relieve against forfeitures, where the party is in no default, and which are the result of accident.

A court of law, since recent decisions in the supreme court of the United States, might hold, that the offer to pay to the agent would entitle the party to maintain a suit at law for the amount of the policy. But even if it would, it would not take away the concurrent jurisdiction of a court of equity. But if a court of law would not relieve, the case made by the bill is one which addresses itself, with peculiar force, to the consideration of a chancellor.

It is said by Lord Coke, that the original foundation of jurisdiction by courts of equity is to be found in fraud, accident and confidence. 4 Inst. 84; Story's Eq., § 76.

The term "accident," in the meaning of a court of equity, is not merely inevitable casualty, or the act of Providence, or what is technically called *vis major*, or irresistible force; but such unforeseen events, misfortune, losses, acts or omission as are not the result of any negligence or misconduct in the party. Story's Eq., § 78.

The rules of law were formerly so rigid that, in many cases which can now be relieved against at law, relief could only be obtained in equity. This is particularly the case in reference to the loss of deeds, mistakes in receipts and accounts, wrong payments or deaths, which made it impossible to perform a condition literally, and also in many other contingencies. But though in many of these cases law will now relieve, the ancient jurisdiction of a court of equity is not thereby lost, and may be properly invoked where the remedy at law might possibly be given, but would not be plain, adequate and complete and free from doubt. Story's Eq., §§ 79, 80.

The contract upon the part of the insurance company in this case was a contract to pay the sum of $5,000 to Mrs. Statham, upon the death of her husband, in consideration of the payment of a sum of money paid by her at the date of the contract, and annual premiums thereafter to be paid by her. These payments were regularly made for a period of ten years, and amounted to upward of $2,000 of principal, exclusive of interest, before the death of Dr. Statham. The use of this money the company has had to the present time, and it will amount, principal and interest, to much more than the $5,000 of principal stipulated to be paid by the policy. This money the company retains, and most unconscientiously refuses payment of the amount of the policy, because it is said, that it contained a condition that this sum should be forfeited in the event Mrs. Statham failed to pay the several premiums on or before the day mentioned in the policy. It is true that the policy does contain this condition, and it is also true that the premium falling due on December 8, 1861, was not paid in fact; but

the non-payment did not arise from any neglect on the part of Mrs. Statham or her representatives. Every effort was made by them to make the payment. It was offered to the agent of the company with whom the insurance was effected, and to whom the ten previous annual premiums had been paid. His agency had not been specially revoked, but he declined to receive it, upon the ground that the existence of the war rendered it unlawful for him to receive it ; that, in consequence of the war, he could not communicate with his principal ; and that proper receipts had not been furnished to him by the insurance company, to be given to the complainants for the money they proposed to pay. The question then arises, whether a court of equity will permit a forfeiture, arising from such causes, to be insisted upon. The condition which was to defeat the right of Mrs. Statham to demand performance of the contract was a condition subsequent to the promise and undertaking on the part of the company to pay ; but whether precedent or subsequent, as the performance of the condition was rendered impossible by the act of the law, as it would have been illegal on the part of Mrs. Statham to pay, as well as on the part of the company to receive payment, during the existence of the war, the case presented to the court is one in which a court of equity has uniformly granted relief. Even at the common law it has been held, that conditions are void and cannot be insisted upon, if they be impossible at the time of their creation, or afterward become impossible by the act of God or of the law or of the party who is entitled to the benefit of them, or if they are contrary to law, or if they are repugnant to the nature of the estate or grant. Story's Eq., § 1304 ; Coke's Com. (Co. Litt.) 206 *a ;* Story's Eq., § 1307 ; Walker v. Osgood, 53 Me. 432 ; Glover v. Taylor, 41 Ala. 124.

Similar decisions have been made in nearly every state and they only declare the well-known rule of the common law. See, also, 2 Pars. on Cont. 672, 673, 674 ; Story's Eq., § 1307.

But courts of equity in relieving against penalties and forfeitures proceed upon more liberal rules than courts of law, and will grant relief in many cases where, by the rigid rules of the law, relief would be refused. Thus it relieves against penalties, the design of which is to secure the due fulfillment of the principal obligation, where the penalty was only accessory and intended to secure the performance of a collateral object. Story's Eq., § 1312, *et seq.*

Relief is given in these cases even where the mere performance was the act of the party, and where compensation can be made to the opposite party, and no distinction is taken in such cases between conditions precedent and subsequent. Story's Eq., §§ 1314, 1315.

But the rule in equity of late years is less liberal than formerly, particularly in England, and to some extent in this country, and there is a tendency not to grant relief where the mere performance of the condition has resulted from the carelessness or negligence of the party. Story's Eq., §§ 1321, 1325; 13 Vesey, 433, 434; 1 Younge and Coll. 98, 110, 112.

But no restriction of the rule has ever been made or ever will be made by which a party is refused relief in equity, where the performance of the condition has been rendered impossible by the act of God or of the law, or by inevitable and overruling necessity.

The supreme court of the United States have, in the action at law, applied the principle we contend for. It there holds that the time in which the courts were closed by war was not to be computed in the time fixed by the statute of limitations for the commencement of suits, although the statutes themselves contained no such exception. 6 Wall. 532.

So, too, it has been held, that war between one country and the country where the note is payable excuses immediate notice of non-payment to the drawer or indorser, but notice should be given in a reasonable time after peace. 2 Broch. Ch. 20; 16 Johns. Ch. 438; 7 Pet. Ch. 586.

The effect of war upon contracts is not to annul, but only

to suspend them. We suspend the right of the enemy to the debts which one trader owes to another, but we do not annul the right. 6 Wall. 532.

A law may suspend the performance of an agreement originally valid by making it impossible without a violation of the law, and yet leave the contract so far subsisting that, on a repeal of the law, the force and obligations of the contract remain. 2 Pars. on Cont. 674; Baylier v. Fettyplace, 7 Mass. 325; Cadley v. Clark, 8 Tenn. Rep. 259.

It certainly has not been settled by any adjudication that the effect of the non-intercourse acts and the war was to revoke the agency. On the contrary, in the case of Ward v. Smith, 7 Wall. 447, the supreme court of the United States have held that such agency was not revoked.

A very analogous case has been decided lately by Judge Blatchford in the circuit court of the United States, for the southern district of New York. A mortgage was given in 1854 to secure certain debts, and in 1863, the creditor, domiciled in New York, obtained a decree in a United States court to sell the property, the defendant residing in the territory of the Confederate States. Judge Blatchford says: "As it was unlawful for the debtors to pay the debt to their enemy creditor during the war, it would be subversive of the first principles of justice to permit the creditor at the same time to enforce the payment of the debt by a sale of lands, especially so when the debtors were, by the terms of the contract, entitled to a notice of sixty days, which it was unlawful for them to receive or the trustees to give." Kanawha Coal Co. v. Kanawha and Ohio Coal Co., Law Review for Oct., 1870, p. 184.

[NOTE. Since this case was argued and submitted, the main questions involved in it have been fully examined and decided by the supreme court of Virginia, in the case of Manhattan Life Insurance Company v. Warwick, 20 Gratt. 614; by the supreme court of Kentucky, in the case of the New York Life Insurance Company v. Clopton, 7 Bush. 179; and, by Judge Blatchford, in the circuit court of the

United States for the southern district of New York, in the case of Hamilton, executor, v. Mutual Life Insurance Company, and in all these cases the court held, that the war did not dissolve the contract of insurance, but merely suspended it and the remedies upon it, and, that a failure to pay the premiums during the war did not forfeit the policy, where such payment could not be made, in consequence of the attitude of the respective parties as belligerents, without violating the law.]

*T. J. & F. A. R. Wharton,* for appellees,

In addition to an elaborate oral argument, filed a written brief, to the following effect:

1. Appellants are not entitled to any relief in equity, because they have full remedy at law, by attachment and garnishment; and the demand set forth in their bill of complaint is strictly of a legal character. Code of 1857, p. 372, arts. 1 and 2; Hutch. Code, 1848, p. 802, § 11; Echols v. Hammond et al., 30 Miss. 177, 178. The decision here referred to overrules that in Freeman v. Guion et al., 11 Smedes & Marsh. 58.

We suppose that article 60, on page 549 of the Code of 1857, is the provision of our statutes on which appellants rely to sustain their case in a court of equity. Neither this nor the decision in Echols v. Hammond et al., *supra,* makes the attachment process a means of conferring jurisdiction upon courts of equity over purely legal demands; on the contrary, this remedy is but for the enforcement of demands of a purely equitable character. Besides, this provision of our statutes is only intended as a remedy in aid of a pending suit, and not as a means of conferring jurisdiction upon courts of equity.

2. Under the terms of the policy of insurance in this case, the bill of complaint is fatally defective in not averring that A. D. Statham died from some cause against which his life was therein insured, and that he did not travel beyond the geographic limits therein specified. This bill of complaint

is silent as to each of these matters, and only alleges that he "departed this life on or about the 20th day of July, in the year 1862." Bowman v. O'Riley, 31 Miss. 261, 264.

3. Appellants are only entitled to a recovery in this action upon sufficient allegations and proof that they, or those under whom they claim, have complied with every one of the conditions specified in the policy of insurance specified in their bill of complaint; and yet their said bill of complaint shows a default in the payment of the premium due on the 8th day of December, 1861, without assigning any such excuse for such default as was provided for in said policy of insurance, and that any default of such payment operated, by express stipulations contained in said policy of insurance, to render null and void such policy of insurance.

The policy of insurance in this case constitutes the only contract between the parties to this suit, and appellants are not entitled to any recovery against appellees, except upon sufficient allegations and proof that the default in the payment of the premium due on the 8th day of December, 1861, had been waived by appellees. The non-intercourse acts of congress, relied on in the bill of complaint as an excuse for such default as to this payment, cannot avail appellants for the following reasons : 1st. Neither such acts of congress nor the civil war referred to in the bill of complaint was provided against in said policy of insurance ; 2d. It was no fault on the part of appellees that appellants, and those under whom they claim, continued to reside in portions of the territories of the United States which, under said acts of congress, debarred them of the opportunity or privilege of paying the premium so due on the 8th day of December, 1861. Such residence being the voluntary acts of said appellants, and of those under whom they claim, appellants must suffer any loss which could happen to them as results of such non-intercourse acts of congress. The offer to pay this premium, so due on the 8th of December, 1861, to A. S. Brown, did not, either at law or in equity, operate as a valid tender of such premium, for the following reasons, as shown

by said bill of complaint: 1st. Because said Brown was not then acting as the agent of appellees; 2d. Appellants' mother was then, under said non-intercourse acts of congress, prohibited from making any such payment; and appellees, for the same reason, were prohibited from then accepting the payment of the premium then so due. See Liddell v. Sims, 9 Smedes & Marsh. 596, 609 ; 1 Story's Eq. Jur. 741, § 776, and note 1 ; Jamison v. McDaniel, 25 Miss. 83, 86 ; Hammon et al. v. Fleming, ib. 135, 142, 143 ; 1 Mad. Ch. 330 ; Story's Eq. Jur. 8 ; 7 Paige, 548 ; Fultz v. Horse, 6 Smedes & Marsh. 404, 410 ; Arnold on Ins. 88; Griswolds v. Waddington, 16 Johns. 438 ; Adams v. Nichols, 19 Pick. 275 ; Horning v. Bingham, 2 Kern. 99 ; Tompkins v. Dudley, 25 N. Y. 275 ; School District No. 1 v. Dauchy, 25 Conn. 530 ; School Trustees of Trenton v. Bennett, 3 Dutch. (N. Y.) 514.

As it was expressly provided in the policy of insurance, in this case, that such policy should be null and void in case of default in the payment of any of the premiums therein provided for, and no provision whatever was therein inserted by which any such default of such payments of premiums could be excused, it follows, from the authorities before cited, that such policy of insurance became null and void, on the 8th day of December, 1861, by reason of the non-payment, on that day, of the premium therein expressly provided to be then paid. In such state of case, and under the authorities before cited, it is wholly immaterial what cause operated to prevent the payment of the premium due on the 8th day of December, 1861, as neither a state of war nor non-intercourse acts of congress, nor even the acts of God, had been provided against by the assured as a cause or causes to excuse such default in such payment. This is certainly correct, unless the courts will go beyond their legitimate powers, and, instead of enforcing contracts as made between the parties litigant, make other and entirely conflicting contracts for them.

But it is contended by appellants' counsel that the right

to pay the premium which was due on the 8th December, 1861, revived to appellants after the expiration of the non-intercourse act of congress before referred to. We deny that this position is sustained either upon any principle of law or the rulings of any court of acknowledged reputation. We would not use language expressive of so much confidence, if the payment of such premiums could, under the contract between the assured and the insurer in this case, to wit, the policy of insurance before referred to, be regarded in the nature of a debt due from the assured to the insurer. It is manifest from the provisions of this policy of insurance, that the payment of such premiums was intended to be only a voluntary act on the part of the assured. It was no more an obligation on the part of the assured to pay these premiums than it was to have made the application for the issuance of such policy of insurance. The only inducement held out by the insurer to the assured to pay these premiums was the forfeiture of the policy of insurance in case of default of such payments. In such state of case it is idle and useless to contend for such revival of the right to pay the premium due on the 8th day of December, 1861, so long as Mr. Justice Blackstone and Chancellor Kent shall be regarded by the courts as profoundly learned in the science of the law.

Chancellor Kent, in speaking of the effects of a treaty of peace, as regards the rights of individuals, states the rule of law thus: "The peace does not affect private rights which had no relation to the war. Debts existing prior to the war, and injuries committed prior to the war, but which made no part of the reason for undertaking it, remain entire, and the remedies are revived. 1 Kent's Com. (ed. of 1836), top p. 168. And Mr. Justice Blackstone, in the third book of his commentaries, marginal page 154, thus defines a debt: "The legal acceptation of debt is a sum of money due, by certain and express agreement," etc. In this case the assured never did contract to pay any of these premiums

as a debt, but only as a condition upon which said policy of insurance should remain in force and effect.

SIMRALL, J.:

This suit in chancery was brought by the complainants, the children and heirs of Mrs. Lucy B. Statham, deceased, who was the wife of Dr. Augustine D. Statham, deceased, against the New York Life Insurance Company, a corporation created by the state of New York, and Benj. G. Humphries, L. Mimms and J. G. Milligan, defendants, to recover the amount of a policy of insurance, on the life of Dr. A. D. Statham, issued in favor of, and to be paid to, his wife, Lucy B., in case she survived her husband, if she did not, then to her children. The bill alleges that Dr. Statham, deceased on the —— day of ———, 1862; that all the annual premiums, from December 8th, 1851, until his death, were paid, except the note due December 8th, 1861, which was tendered to Brown, their resident agent, who declined to receive it; and moreover the pendency of the civil war excused the payment and prevented a forfeiture of the policy; that Humphries, Mimms and Milligan, have in their hands, effects and moneys, belonging to the company, which will be remitted to them at New York, unless restrained by injunction.

The bill was dismissed on demurrer, and appeal to this court. The first question is as to the jurisdiction of the chancery court. The remedy (it is said) ought to have been at law on the policy of insurance, or by an attachment at law, to seize the effects and credits in the hands of Humphries, Mimms and Milligan.

This is the renewal of a controversy which prevailed in the high court of errors and appeals for several years, whether the complainant (in such a case as this) must not show in his bill a distinct ground of equity, in addition to the fact that his debtor is absent from, or a non-resident of, the state, and that the home " defendant has effects belonging to, or a debt due to him," that the "absconding" or non-resident debtor has lands or tenements in this state; which view of the sub-

ject ought to have prevailed, as an original proposition, was not considered by this court an open question, in Scruggs et al. v. Blair, decided October term, 1870 ; but re-adhered to what was laid down in Trotter v. White, 10 Smedes & Marsh. 612, and Freeman v. Gwin, 11 ib. 62, accepting as the doctrine which had been established, "that the basis of the jurisdiction is purely statutory, and depends on the condition of facts, stated in the statute, to wit : "The absence of the debtor, the presence here of effects belonging to, or a debt due to, him, or his owning lands and tenements in this state."

The allegations of the bill are within the terms of the statute ; the New York Life Insurance Company, the debtor, is a non-resident corporation, created by and resident in the state of New York ; B. G. Humphries, Mimms and Milligan, resident defendants, are charged to have funds and effects of the debtor, in their hands, which they will transmit to New York, unless restrained by injunction.

The question has been settled by the supreme court of the United States in many cases, that the late civil war brought along with it, as between the belligerents, the consequences and disabilities incident by international law to foreign war. Among these are a suspension of the right of suit upon all contracts made before the war, so long as it continued, and a prohibition of all intercourse, commerce, dealing and trading, between the inhabitants of the respective belligerent countries, except by license granted by competent authority.

Under authority of the act of congress of July 13th, 1861, the president of the United States, by proclamation of August of that year, declared certain of the southern states, and parts of states, including Mississippi, in a state of insurrection, and that all commerce between said state and the inhabitants thereof, and citizens of the other states, was, and would continue, unlawful, until such insurrection should cease, or be suppressed, and that all goods, chattels, wares and merchandise, coming from said state into other parts of

VOL. XLV. — 75

the United States (without special license of the president), would be forfeited to the United States. The restrictions and prohibitions continued until May 22, 1865. See Mrs. Alexander's Cotton Case, 2 Wall. ; The William Bagaly, 5 ib. 377 ; Hanger v. Abbott, 6 Wall. 532.

The excuse offered for non-payment of the premium note falling due December 8th, 1861, was, that the pending war made it impossible and illegal for the promisor to go to the city of New York, and make the payment to the insurance company, domiciled there, and that it was also illegal and impracticable to make remittances. And second, that an offer of the money was made to the agent here through whom the policy of insurance was effected, but that he declined to receive it, for the reason that the war had put an end to his agency, and moreover his accepting the money would be an illegal act. Between the date of the maturity of this premium note, and December 8th, 1862, Dr. Statham deceased. The question made is, whether this default in the payment of the premium worked a forfeiture of the policy. The covenant is to the effect that if the annual premiums are not paid, but default is made when any one of them becomes due, then the policy ceases and is of no effect.

For the insurance company it is said, that the covenant is absolute, without condition or exception ; and, therefore, the party cannot set up any excuse or exception, which might have been introduced into the original contract ; that if inevitable accident or other contingency is not stated in the contract as excuse or reason for non-performance, such defense cannot be set up, and reference is made to Jamison v. McDaniel, 25 Miss. 83, and Hammon v. Flemming, 23 ib. 142, where the general doctine is so laid down. It is claimed therefore as a legitimate deduction from the principle, that inasmuch as the casualties of war might, for a time, interrupt the agency of the company in this state, and render a payment at the home office in New York impracticable and illegal, unless that condition of things is provided for in the policy, and stated as a reason for a postponement

of the payment of the premium, and an exception which should not work a forfeiture, it is not provided against, and the party must take the consequences of such omission.

It is deduced by Mr. Duer, in his work on Insurance, p. 473, from the authorities, that a war between the countries of assurers and assured from the time that it occurs renders a prior marine insurance illegal and void, precisely for the reasons that render the contract illegal in its origin, when made during the war.    Gray v. Lewis. 3 Wash. C. C. 280 ; Leather v. Com. Ins. Co., 3 Bush. (Ky.) 298 ; 4 East, 410 ; ib. 407.

It may be questioned whether war renders a contract void, or only suspends its enforcement, is dependent so much upon its character as "executed" or "executory," as upon the question whether they give aid and comfort to the enemy, and, second, whether they involve intercourse.

If the war had the effect to annul the insurance, by this company, on the life of Dr. Statham, he being a citizen of Mississippi, then it became and was annulled and dissolved on the day that the war begun or was declared to exist by the proclamation of the president on August 16, 1861 ; although the premium note due the preceding 8th of December had been paid, and there was no default in any of the conditions at the time of the decease of Dr. Statham.    Is there not a distinction which may be clearly discerned and which is substantial between a life policy and a marine policy. The cases cited go on the predicate that a contract of insurance is one of indemnity and tends to encourage the commerce of the enemy, which it is a main object of the war to prevent and destroy.    Therefore, the subjects of one country shall not be permitted to lend assistance to encourage and promote, by insurance, the commerce of the other belligerent.

In what respect does a policy of life insurance, issued before the war, assist and strengthen the assured, or his country, in the prosecution of the war.    All that can be done, or is required to be done, is to pay the annual premi-

ums.  If this could be done without sending the money to the insurer, it would, in no wise, increase the strength and power of the assured in his country to do hostile acts, nor would it diminish or affect the resources of the country of the assurer.

But analyze this policy, and its legal elements are these : The assured engages, upon the payment of so much down, and an annual sum, so long as Dr. Statham lives, within sixty days after his death, on notice and proof of the fact, to pay to the owner of the policy $5,000.  Punctually the payment of the annual sums must be made, on the pain of losing the right to demand the $5,000.  (There are other conditions not important in this connection to be named.) When the war broke out the assured had done nothing ; indeed no act of performance would devolve upon him until after the death of the assured.  When that occurred the war was in existence, and he could not lawfully remit from New York the $5,000.  Was his duty to do so annulled or discharged, or the remittance postponed, until the impediment was removed, and intercourse and business might lawfully be resumed ?

In what essential feature does this contract differ from an advance of money, made by a citizen of New York in 1851, on the bond of a citizen of this state, payable sixty days after the death of Dr. Statham, on the consideration of an annual payment of $200 ?  It would not be asserted that the war, *propria vigore*, annulled the contract.  It was legal when made.  There was no legal impediment in the way when entered into.  The war could have no other effect than to suspend remedy upon it or performance of it, because of the interdict of all commerce and intercourse between the parties.  But the contract between the insurance company and complainant's mother has an additional feature ; that, if the annual premiums are not punctually paid, the policy should be of no effect, but shall cease and determine.  But the bill alleges that a tender was made to the agent of the defendants of the premium on the 8th

December previous to the death of Dr. Statham. The war did not put an end to his agency. In Morey v. Clark, 10 Johns. 69, it was determined that an alien enemy, resident in the United States during a war between his country and the United States, could sue and be sued. If he may sue for a debt, *a fortiori*, he may receive it without suit. It was ruled on the Pennsylvania circuit, by Judge Washington, in Cow v. Penn and Denniston, and McGregor v. Imbrick, that debts might well be paid to the agent of an alien enemy residing in the United States. But that "remittance" to the principal could not be made pending the war. In Buchanan v. Curry, 19 Johns. 140, arising upon a contract for the sale and delivery of lumber, made between a British subject and a citizen of New York just before the war of 1812, it was held that the delivery of the lumber after the war begun, to a resident agent of the alien enemy, was a valid act, not inhibited by the international law. It was pressed by counsel that the war revoked the agency, and made all dealings, directly or indirectly, with an alien enemy illegal. To that the very able judge, responding for the court, said, "the rule (invoked) is founded in public policy which forbids, during war, that money or property, or other resources, shall be transferred so as to aid or strengthen the enemy." The evil and mischief which the principle condemns is, the "exportation" of money or resources, and not in delivering or paying them to an alien enemy residing here, or his agent, under the control of the government. To the same effect is Denniston v. Imbrie, 3 Wash. C. C. 396, *supra;* Paul v. Christie, 4 Harris & McHenry, 161; Ward v. Smith, 7 Wall. 452; United States v. Grossmeyer, 9 ib. 75.

The war then did not, *per se*, revoke the agency of Brown, nor make it unlawful for him to receive the premium which was tendered December 8th, 1861. A payment to him would have been a discharge of the debt. The policy of war interdicted his remittance of the money to his principal, for that would have implied intercourse, and would have

aided the other belligerent with the sinews of war. His performance of that duty would be "suspended" until the war was over.

Griswold v. Waddington, 16 Johns. 438, is a most exhausting research into the authorities, as to the effect of war upon the relations of the inhabitants of the respective belligerents. As a general proposition, war suspends the performance of *ante bellum* contracts, and denounces as illegal and invalid those made *pendente bello*. If an *ante bellum* contract is dissolved at all, it is because its performance is inconsistent with the duties and allegiance which the parties owe to their respective countries, and involves some violation or infringement of these, and which has not been performed in whole or in part by either party. The annihilation of such a contract would not be injurious to either party, but would rather dissolve their inconvenient relations. But if the contract has been partly executed by one party, by parting with money or other valuable things, on the consideration and promise that the other will perform his part of the engagement, it would be gross injustice, and repugnant to reason that intervening war should destroy the contract, devolving all the loss upon one party to the gain of the other. Nor should that be so unless an overruling policy should so require. Such as to continue the contract in force, or to attempt its performance, would necessitate intercouse, commerce or the exchange of money or property between the respective parties, which would be inconsistent with their changed relations superinduced by the war. If the contract may be preserved or performed without the transmission of money or property from one enemy to the other, or without their intercourse or correspondence, then no principle of law or policy, arising out of a state of war between their respective countries, would demand an abrogation of the contract, or its non-performance. Reason is the life of the law, and when it ceases the law itself dies. A contract made in 1860, by a citizen of this state, to deliver cotton to a citizen of New York, on the 1st

day of October, 1861, at Vicksburg, is not necessarily annulled by the war. If delivery had been made to the agent of the purchaser at Vicksburg, it would have been a legal act contravening no policy or law of war, and the right of the seller to recover the price, after the war, could not be disputed. If the agent had attempted to transport the cotton to New York, pending the war, then and not until then would criminality attach.

But there is another view of the subject arising out of the statute regulating foreign insurance companies doing business in this state. Code of 1857, p. 303. They are required to file in the office of the auditor of public accounts a statement of their capital stock and resources, appoint an agent before they begin to do business. This agent as fully represents the corporation here as their officers in the state of their domicile. Service of legal process upon him is of the same virtue as if upon the corporation. In effect the corporation acquires a *quasi* domicile here, and through its resident agent must transact its business. It is not permitted to withdraw its fund derived from premiums upon risks until losses have been adjusted. The defendant assumed the risk in dispute under the terms and responsibilities of this law, among which was the condition that it shall appoint an agent, through whom contracts of insurance shall be made, to whom premium payments may be made, and by whom obligations incurred by them shall be discharged and paid. The plain intent of the statute is to localize the contract, in its inception, and in the several stages of its performance. It may be seriously doubted whether, since this contract was made under this condition, of the law, the defendants ought to be heard to insist upon a forfeiture of the policy for non-payment of the premium at their home office, when there was no legal impediment to the continuance of an agency here. Foreign companies, dealing with our citizens under this law, must be considered as engaging to accept performance from the assured here, and on their part to pay losses here. These views are in the main sustained by New

York Life Ins. Co. v. Clopton, 7 Bush. (Ky.) 179, and the Manhattan Co. v. Warwick, 20 Gratt. 614, by a majority of the court, and by Hamilton v. Mutual Ins. Co. of New York, by Judge Blatchford in the circuit court of United States for the southern district of New York, whose opinion we have seen.

But it is said by counsel for appellees that the demurrer ought to have been sustained, because the bill does not negative and obviate all the conditions of the policy, upon non-compliance with which it became void and of no effect. In order to indicate this infirmity in the bill, resort is had, by counsel, to the policy, which is made an exhibit thereto. It was recently determined by this court that a demurrer only brought into review the allegations of the bill, and that the chancellor was confined to them in determining whether the exceptions made in the demurrer were well taken or not ; that the exhibits could not be looked to, either to aid a defective and insufficient statement of the title to relief and discovery, or as taking away and defeating such right. They were rather evidence than pleading.

We are not permitted, therefore, to depart from the allegations of the bill, or to consider them in connection with the exhibits, in determining whether the demurrer should be sustained or not. Looking to the bill in this aspect, it does disclose a *prima facie* right to relief, and that is all that is required. The assurer may overcome this *prima facie* case by averring and proving a forfeiture of a right to the money, by non-compliance with one or more of the conditions imposed on the assured, which, by the contract, would produce that result.

These views embrace all the points necessary to be considered in order to dispose of the case. It would be unnecessary to consider separately the numerous causes assigned in the demurrer.

Wherefore the decree of the chancellor, sustaining the demurrer and dismissing the bill, is reversed, judgment rendered here, overruling the demurrer, and cause remanded.