DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY,

## AT JUNE TERM, 1874.

---

THE MUTUAL BENEFIT LIFE INSURANCE COMPANY, PLAINTIFFS IN ERROR, AND HENRIETTA HILLYARD ET AL., DEFENDANTS IN ERROR.

1. All commerce and friendly intercourse between citizens of the insurrectionary states and districts, and the rest of the Union, during the recent civil war, were suspended, and any act of intercourse inconsistent with the condition of hostilities, was unlawful.

2. As a consequence, it was unlawful between such citizens to remit, or to receive the money to pay a premium on a policy of life insurance coming due during the war, as it involved an act of amicable intercourse.

3. Whether a pre-existing contract is dissolved, or not, by the war, depends upon whether it is essentially antagonistic to the laws governing a state of war. If the contract is of a continuing nature, as in the case of a partnership, or of an executory character merely, and in the performance of its essential features, would violate such laws, it would be dissolved; but if not, and rights have become vested under it, the contract will either be qualified, or its performance suspended, according to its nature, so as to strip it of its objectionable features, and save such rights. The tendency of adjudication is to preserve, and not to destroy contracts existing before the war.

4. A policy of life insurance, issued before the war, by a corporation in this state, for the benefit of parties in Virginia, where premiums had

previously been paid, is not dissolved or forfeited for the mere non-payment of a premium falling due during the war, and where the payment, with proper interest, was promptly tendered at its termination. The payment had become impossible by the act or force of the law, and, for that reason, was suspended, and excused for the time being.

5. A condition for the payment of the premium on a life policy after the first, is *sui generis*, and not of the nature of a condition precedent to the vesting of a right, and is subject to be suspended, the same as clauses for performance in any other contract.

6. The fact that the insurance company is mutual, does not create a partnership among the insured, so as to make the contract continuing—the insurance is between the corporation and the insured.

7. The fault of the rebellion cannot be imputed to the plaintiffs, so as to make the non-payment their fault; the law deals with the existence of hostilities, and considers all citizens of the belligerent states respectively, as mutual enemies. The causes of the contest do not affect the legal results between the individuals.

In error to the Supreme Court.

For former proceedings in this case, see 6 *Vroom* 415.

For the plaintiffs in error, *Teese* and *B. Williamson*.

I. The defendants in error, being *cestuis que trust* only, cannot maintain this action. It should have been brought by the legal representatives of the trustee, Edwin Hillyard.

It is not denied, in the opinion, that *cestuis que trust* cannot maintain a suit at law in their own names, but it is said, " *the agent who effected the insurance* is styled a trustee, but that does not make him such," &c., (*page* 20, *line* 7,) but,

1st. There is no evidence afforded by the policy itself, (which is set out in the declaration with a *profert, page* 2, *line* 10, and begins at the word " *the*," *line* 12,) that Edwin Hillyard was any more of an agent of the plaintiff's than any other trustee is an agent.

2d. The true insurer was neither the plaintiffs nor the trustee, but *John H. Hillyard*, the father of seven daughters, who insured his life for their benefit (*page* 2, *line* 18.)

3d. If it were true, as the opinion supposes, that Edwin Hillyard acted as an agent as well as a trustee, it would make

no difference. Trustees are always, in some sense, agents for the *cestuis que trust. Perry on Trusts,* § 874.

It is perfectly well settled law, that *cestuis que trust* cannot sue in their own names—

"The action of assumpsit is an equitable action, and, generally, if a promise is made to one for the benefit of another, the person for whose benefit the promise is made, may bring the action ; *but if a promise is made to a trustee for the benefit of the cestui que trust, the trustee alone can sue." Perry on Trusts,* § 330.

"If the *cestui que trust* were permitted to sue at law in his own name, *the benefit and protection intended to result from the intervention of a trustee clothed with a legal title, might be lost." Chitty's Pl., p.* 2.

The cases bearing upon this subject are all considered in *Treat* v. *Stanton,* 14 *Conn.* 445. The court, *p.* 454, say : "*No case has been cited, nor is it believed that any can be found,* where, on a promise made to one sustaining the character of a trustee, the *cestui que trust,* or person ultimately interested, has been permitted to bring an action upon it. In such case, the obligation and legal responsibility is *exclusively* in the trustee, and must be enforced *by him* in a court of law."

The question to be decided, in an action brought by a third person, on a promise made for his benefit, is, *to whom,* by the contract, *is the money to be paid ?* If A promise B that he will pay C, C may maintain an action against A, but it is on the ground that the contract is, that A will pay direct to C. *Company of Felt Makers* v. *Davis,* 1 *B. & P.* 102.

But the very object of the creation of a trustee is *to prevent* the real party in interest from having the money paid directly to him. It is for the *protection* of the *cestuis que trust. Chitty's Pl., supra.*

II. The late war of insurrection and rebellion against the United States, cannot be pleaded in a court of law by a citizen of the rebellious states, as an excuse for the non-performance of his contract.

The excuse for the non-payment of the premiums during the war is, the late war of the rebellion, and the proclamation of the President, in consequence thereof, and that payment was impossible, "*for that, and no other cause*." (*P*. 5, *l*. 5.)

War is considered the individual act of each citizen of a belligerent power. Such citizen cannot, after the war is ended, go into the courts of the other belligerent and claim that he was prevented by the acts of that government from performing his contract. The courts of the latter government will conclusively presume that the acts of their own government were right, and were caused by the wrongful acts of each and every member of the other government. *Touteng* v. *Hubbard*, 3 *B. & P*. 291.

"All the cases admit that where a party has been disabled from performing his contract *by his own default*, it is not competent for him to allege the circumstances by which he was prevented as an excuse for his omission. May not the loss which the present plaintiff has sustained be considered in a political point of view *as arising from his own default?* Must not *every subject* of the Swedish state be answerable for what we must consider as an act of aggression on the part of his sovereign? * * Here the impossibility has arisen from an act of the British state, to which all his Majesty's subjects are parties, occasioned by an act of the Swedish court, *to which all the subjects of Sweden are parties*." *Id*. 302. "We, sitting here, and every good British subject, must consider (the embargo) as an act justified by the conduct of the court of Sweden towards this country. * * *It would be a total violation of every rule by which the courts have been governed respecting actions brought against British subjects, by persons in a more or less extensive degree of hostility, to suffer this plaintiff to recover*." *Id*. 299.

The same doctrine is held by the Supreme Court of the United States. In *White* v. *Burnley*, 20 *How*. 249, the court say: When one nation is at war with another nation, all the subjects or citizens of the one are deemed in hostility to

the subjects or citizens of the other. *They are personally at war with each other, and have no capacity to contract."*

If this is the law in relation to *alien* enemies, a *fortiori* must it be the law where the plaintiff was in insurrection and rebellion against his own government, and seeks to set up his *treason* as an excuse for the non-performance of his contract.

"*At no time during the rebellion were the rebellious states out of the pale of the Union."* *White* v. *Hart*, 13 *Wall.* 646.

"All persons residing within this territory, whose property may be used to increase the resources of the hostile power, are in this contest liable to be treated as enemies, *though not foreigners."* *Prize cases,* 2 *Black* 674.

"As against rebels in insurrection against the government, the United States possess both *sovereign* and belligerent rights." *Id.*

"The whole confederate power must be regarded by this court *as a usurpation of unlawful authority."* *U. S.* v. *Keeler,* 9 *Wall.* 83 ; *U. S.* v. *Stark,* 11 *Law Reg. N. S.* (*Jan.,* 1872,) 37 ; *Mrs. Alexander's Cotton,* 2 *Wall.* 421, 422; also see cases collated in 1 *Brightley's Fed. Dig. of U. S. Rcpts.* 849.

This very point, viz. : That a declaration setting up this excuse for the non-payment of premiums on a life insurance policy will be held bad *on demurrer,* has been decided in the case of *Dillard* v. *Manhattan Life Ins. Co., (Georgia ;) Bliss on Life Ins.* 645.

Certain belligerent rights to the rebellious states were granted by the government through motives of humanity, *and to protect loyal citizens* in their rights, (*e. g.* the suspension of the statutes of limitation; otherwise rebels in arms might claim the benefit of those statutes.) See the above cases *passim.*

III. The payment of the annual premiums in the declaration mentioned, was a *condition precedent* to the payment

of the amount for which the suit is brought; therefore no excuse for their non-payment is admissible.

A condition precedent is: "A condition preceding the vesting of an estate or the accruing of a right."

The declaration says, that the policy "*was accepted by the assured upon these express conditions,*" &c. ; "*upon the faith of which that agreement was therein declared to be made.*" Among others, "that in case the said Edwin Hillyard, trustee, should not pay the said annual premium on," &c., "the said company *should not be liable,*" &c.

"In the case of a condition precedent, the plaintiff must aver and prove either his performance of such condition precedent or an offer to perform it, which the defendant rejected," &c. *Chit. Cont.* 738.

To this effect are all the cases. *Cutter* v. *Powell*, 6 *T. R.* 320 (2 *Smith L. C.* 1;) *School Trustees of Trenton* v. *Bennett*, 3 *Dutcher* 517.

*Conditions in policies of insurance* must be strictly performed. *Bunyan on Life Insurance*, 64; *Want* v. *Blunt*, 12 *East.* 183; *Tarleton* v. *Stainforth*, 4 *T. R.* 695; *Catoir* v. *The Am. L. I. Co.*, 4 *Vroom* 487, 489.

The reasons given in the opinion why this policy is excepted from from the general rule, are—

1st, (*p.* 9, *l.* 21,) that "the payment of those premiums at the stipulated times became legally impossible. *If they had been tendered the defendants could not, without doing an unlawful act, have received them.*"

But the authorities are to the effect that it would not have been unlawful to have paid the premiums, either to an agent of the defendants at the domicil of the defendants in error, or *to the company at the place of its domicil in New Jersey.* The money in such case not being withdrawn beyond the control of the latter government." *Opinion, p.* 19, *l.* 1; *The Manhattun L. I. Co.* v. *Warwick*, 20 *Gratt.* 614; *Cohen* v. *N. Y. L. I. Co.*; *Bliss on Life Ins.* 646, where it was held on demurrer that "the complaint does not show sufficient obstacle *to paying the premiums in New York by the mere con-*

dition of war." *Buchanan* v. *Curry*, 19 *Johns.* 137; *Kershaw* v. *Kelsey*, 100 *Mass.* 561, 573.

2d, (*p*. 14, *l*. 8,) that "the true meaning of the agreement read in the light of its necessary implication, is that the premiums were to be paid at the time specified, unless prevented by the act of God or of the law."

No authority is cited for thus excepting *life insurance* policies from the operation of an otherwise general rule, but by way of illustration it is stated (*p*. 13, *l*. 33,) that "according to the view of the defendants, and regarding this stipulation as unqualified, if the assured, *on one of the days for annual payment*, being on his way to settle the premium, had been taken with sudden sickness, and had remained in a state of insensibility until the time for payment had passed, all his interest in this policy would have been irretrievably forfeited."

But the Court of Appeals of New York have decided that in just such a case the policy *was* forfeited. *Howell* v. *The Knickerbocker L. I. Co.*, 44 *N. Y.* 276.

In this case Howell's premium became due on the 15th of July, at noon. *On that day* he left his house for his place of business in apparent good health, *intending to pay the premium* for the continuance of the policy. About ten o'clock of that day he was struck with apoplexy, which proved to be fatal, and rendered him helpless and speechless, and he continued wholly unconscious until the next day, when he died. The premium was tendered by the plaintiff the day after the funeral. Upon this state of facts the court decided that "payment upon the day specified *is a condition precedent*, and unless performed, the policy is no longer in force, *although performance is prevented by act of God.*"

"Although the person whose life is insured is stricken with a fatal disease during the continuance of the term of insurance, *so as to be in a dying condition*, this is not sufficient to establish the loss insured against; *and if he actually survives until the term expires, the insurer is not liable.*"

It is stated (*p.* 11, *l.* 16,) "the examples adduced (in support of the plaintiff's view) are all cases of difficulty and not of impossibility of performance."

But is not this case one of difficulty *only*, and *not* of impossibility? It was physically *possible* for the defendants to have left the rebellious states. Legally and politically it was their *duty* to have done so. The cases above cited prove that during the entire war they were just as much *citizens of the United States* as were the citizens of New Jersey; and that if they had changed their domicil to the loyal states, there was no law, either civil or criminal, by which they could have been molested, simply because they had previously resided in one of the insurrectionary states. 2 *Kent's Com.* 63.

IV. The said contract of insurance was *an executory contract*, which was annulled by war.

"An executory contract is a contract designed to be executed or carried into effect in future, or to take effect on a future contingency."

The argument in the opinion is, that because the performance of the contract became impossible by the war, therefore its performance is *excused. p.* 16.

The prior decisions are to the effect that in such case the contract is *annulled.*

"Executory contracts with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, *are dissolved* by the declaration of war." *Hanger* v. *Abbott*, 6 *Wall.* 536; *The William Bagaley*, 5 *Wall.* 407; *Odlin* v. *The Penn. Ins. Co.*, 2 *Wash. C. C. R.* 312; *Gray* v. *Sims*, 3 *Wash. C. C. R.* 280; *Lathers* v. *Commercial Ins. Co.*, 2 *Bush* 298.

V. The said contract of insurance being *on the life of an enemy*, who died during the war, it was annulled by the war. See cases *supra;* also, *Furtando* v. *Rodgers*, 3 *B. & P.* 199; *Kellner* v. *LeMesurier*, 4 *E.* 396; *Gamba* v. *LeMesurier*, 4 *E.* 407; *Brandon* v. *Curling*, 4 *E.* 409; 3 *Kent's Com.* 254;

*Bunyan on Life Assurance* 19; *Mitchell* v. *Mu. L. I. Co.*; *Bliss on Life Insurance* 645.

VI. The plaintiffs in error are *a mutual company.* Their members bear to each other the relation of partners. The partnership with members in the rebellious states was dissolved by the war, and those assured members cannot maintain an action *at law* against the plaintiffs in error for losses happening during the war.

It appears by the record that the plaintiffs in error are a mutual company. They are so styled; *page 2, l. 33,* refers to the taking of *notes* from members; *page 3, l. 33,* refers to the *profits* to be made by the members.

These are the indications of a *mutual* company. *Bliss on Life Ins.* 84, § 61, 734, 735, § 464.

The declaration sets forth that the plaintiffs are a body corporate of the state of New Jersey.

The charter of the company (*Laws of* 1845, *p.* 25,) provides for the division of profits and losses among its members.

*Story on Part.,* § 2, defines a partnership to be "a voluntary contract between two or more competent persons, to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, with the understanding that there shall be a *communion of the profits* thereof between them."

The definition of a Mutual Insurance Company, in *Belleville Mu. Ins. Co.* v. *Van Winkle,* 1 *Beas.* 345, brings a mutual company within Story's definition of a partnership. *Mitchell* v. *Mu. L. I. Co.; Bliss on Life Ins.* 739; *White* v. *Madison,* 26 *N. Y.* 117; *White* v. *Haight,* 16 *N. Y.* 310; *Fisher's Dig.* 4723.

All the authorities agree that a partnership is dissolved by war. *The William Bagaley,* 5 *Wall.* 377; *Story on Part.,* § 316; *Griswold* v. *Waddington,* 16 *Johns.* 438; *Seaman* v. *Waddington,* 16 *Johns.* 510; *White* v. *Burnley,* 20 *How.* 249; *Hanger* v. *Abbott,* 6 *Wall.* 535.

For the defendants in error, *Dixon*.

I. The action in the Supreme Court was rightly brought in the names of the defendants in error.

The declaration alleges an agreement, not under seal, between plaintiffs and defendant, by which defendant assured the life of plaintiffs' father, in the sum of $5000, payable on the father's death, in trust, to E. H., for the benefit of plaintiffs, and then alleges such facts as that the $5000 became payable, and the death of E. H., and, thereupon, a promise by defendant to plaintiffs to pay said $5000 to plaintiffs.

The facts set out, independent of the promise alleged at the close of the declaration, are sufficient, in law, to maintain a suit by plaintiffs, if by any one.

*a.* The contract is a simple contract, without seal.

*b.* It was made between plaintiffs and defendant.

*c.* The money payable was solely for the benefit of plaintiffs; E. H. having no interest in it, but being merely agent to receive it and pay it over to plaintiffs.

From these facts the law would imply a promise to pay plaintiffs, on which they might maintain an action in their own names. 1 *Chit. on Pl.* 4; 2 *Saund. on Pl.* 230, (*Ins.*;) 7 *Bac. Abrid.* 186; *Feltmakers* v. *Davis*, 1 *B. & P.* 101, *note* 6; *Piggott* v. *Thompson*, 3 *B. & P.* 147, *and note A.*

These facts are certainly sufficient to maintain the express promise averred in the declaration to have been made by defendant to plaintiffs to pay to them. They show that the money in defendant's hands belonged to plaintiffs; that is enough to sustain the promise. *Lilly* v. *Hays*, 5 *Ad. & Ell.* 548 (31 *E. C. L. R.* 726;) *Carnegie et al.* v. *Morrison et al.*, 2 *Metc.* 381.

II. The facts stated in the declaration do not show such a condition of war as would put an end to the agreement declared on.

War is a condition of actual hostility between independent nations.

The condition of things averred in the declaration is merely that the President of the United States had proclaimed the inhabitants of Virginia, where plaintiffs resided, to be in a state of insurrection.

Such a proclamation, outside of any statutory provision, would have no more effect upon contracts than the reading of the riot act.

But, if the court goes outside of the record, and takes judicial notice of the condition of public affairs at the time, still the legal aspect is not that of war, but of insurrection or rebellion.

So far as respects citizens of the United States, and those within the jurisdiction of the United States, war cannot exist until declared by congress. As to those whom the United States constitution controls, no court can adjudge war to exist, unless congress declares it. Under that constitution congress has exclusive right to declare war. *U. S. Constitution, Art.* 1, § 8; *Story's Com. on Cons.*, § 1172.

The effects of war are very different from the effects of insurrection. War, *ipso facto*, produces a condition of hostility between all the citizens or subjects of the warring nations. Insurrection, *ipso facto*, affects only the relations of those who engage in it. All results which flow outside of these relations, spring from the legitimate exercise of the powers of government in suppressing the insurrection. These results, so far as they are not the effects of material force, so far as they are theoretical changes in the legal status of persons or things, are to be ascertained, not by international, but by municipal law.

An insurrection in Virginia does not produce a condition of hostility between the citizens of Virginia and the citizens of New Jersey; does not render illegal commercial intercourse between them, or abrogate any contracts they may have with each other, except so far as the United States constitution, and the laws passed in pursuance thereof, may provide for these results.

III. But even war would not terminate the contract declared on in this case.

The contract is called a policy of insurance, but in fact, it is an agreement, that in consideration of the payment of $302.50 to defendant, annually, during the life of J. H. H., defendant will on the death of J. H. H., pay $5000 to plaintiffs.

It differs essentially from a policy of fire or marine insurance. The latter is a contract of indemnity, the amount of liability being governed by the amount of loss—it is for a definite time, and then to end—it is against the risk of an event which may never happen; in it the risk of the insurer is constantly decreasing.

But in the contract of life insurance, there is no indemnity, the amount of liability is fixed and definite. The contract is for an indefinite time, it provides for an event sure to happen, and the risk of loss to the insurer is constantly increasing, until it culminates in the end of the insured life. *Dalby* v. *The India & London Life Ass. Co.*, 80 *E. C. L. R.* 365, and note.

No analogy, therefore, can be drawn from the effect of war, on policies of fire or marine insurance, to its effect on this contract.

But the best considered cases hold that war abrogates fire and marine policies upon the enemy's property, and other contracts only so far as they aim to indemnify against the risks of war, or because they encourage the commerce or strengthen the resources of the enemy, which it is the policy of war to destroy. *Furtago* v. *Rogers*, 3 *B. & P.* 191; *Kellner* v. *Le Mesurier*, 4 *East.* 366; *Gamba* v. *Le Mesurier*, 4 *East.* 407; *Griswold* v. *Waddington*, 16 *Johns.* 438; *Buchanan* v. *Curry*, 19 *Johns.* 136; *Kershaw* v. *Kelsey*, 100 *Mass.* 561; *Ex parte Boussmaker*, 13 *Vesey, Jr.*, 71.

The contract, in this case, is of no such sort.

It could not encourage J. H. H. to enter into the service of the rebellion, or to do any other illegal act, for if he entered

the military or naval service of the rebellion, or died in the violation of law, then the contract, by its terms, was avoided.

It did not indemnify against any loss which was to grow out of the hostile condition, or in any way encourage or strengthen the rebellion.

War also abrogates contracts of continuing performance, such as those for commercial partnership, where the very object of the contracting parties is the doing of that thing which the law, in time of war, forbids. These contracts, of necessity, cease when war begins, but the rights of the parties, as they existed then, remain, to be enforced when war ends. *Griswold* v. *Waddington*, 16 *Johns.* 438, 488.

But the contract declared on is not one of continuing performance in such a sense ; performance is to be periodical, not continuous ; the war may begin and end, between two periods fixed for an act to be done under it, and if it does not, still the act is only the payment of money, which may be suspended without injustice, while the contract itself cannot be abrogated without the grossest inequity.

Nor is the relation of the parties to the contract that of a commercial partnership, or of a partnership in any such sense. If it were, and the war dissolved it as to this one partner, then it dissolved it as to every partner, and the death of any partner, in like manner, would terminate it as to all. *Story on Part.*, §§ 315, 317.

And the effect of such a dissolution would be, not to deprive any partner of his interest in the joint property, as is claimed in this case, but merely to end the partnership bond.

Suppose the assured life had ended after the war broke out, and before the next premium became due, then, if this claim of defendant is well founded, the rights of the plaintiffs would, nevertheless, be gone. The $5000 for which they had been paying to the defendant $302.50 annually, from 1849 to 1860, and to which, had peace continued, they would have been entitled without further payment, would be lost, and the defendant would gain it.

Upon no principle in the law can such a claim rest. War

does not confiscate private property for private gain. No private interest is ever touched, except by the hand of the government itself, and then only for purposes connected with the effective prosecution of the war; and the range within which even this power is properly exercised, is constantly diminishing. *Brown v. U. S.*, 8 *Cranch* 110; *Mrs. Alexander's Cotton*, 2 *Wall.* 404; 1 *Kent's Com.* 60; *Schooner Juanita*, 1 *Newberry Adm.* 352.

The case is but little less injurious when, as here, only one more payment was ever to become due to defendant.

We insist, therefore, that war would not abrogate or avoid this contract.

IV. The declaration sets up a sufficient excuse for the non-payment of the premium falling due on December 27th, 1861. This excuse is, that before, on, and after that day, plaintiffs, and all other individuals named in the policy, were inhabitants and citizens of Virginia, and the defendant was a citizen and inhabitant of New Jersey; that, before that day, the President of the United States proclaimed the inhabitants of the state of Virginia and the state itself, to be in a condition of insurrection against the United States; that the proclamation remained in force, and the condition of hostility continued until after that day, and that, thereby, the payment became impossible and unlawful, in both plaintiffs and defendant, and that, as soon as the impossibility and illegality ceased, plaintiffs tendered the premium, with interest, to defendant.

This illegality arises, not from any principle of common law, but from the act of congress, approved July 13th, 1861, (12 *U. S. Stat. at Large* 255,) and a supplementary act, approved July 31st, 1861. (12 *U. S. Stat. at Large* 284.)

The proclamation of the President is in same book, page 1262.

The excuse is properly pleaded. The pleading should not aver that the President forbade commercial intercourse because he was not authorized to prohibit it. He was only authorized to declare the state of insurrection to exist; and,

thereupon, the law forbade it.    The law need not be pleaded, but only the facts upon which the law takes effect.

The excuse is a good one ; it is that the law forbade the payment at the time, forbade the plaintiffs to pay, forbade the defendant to receive.

The effect of the law was to suspend the performance of the contract for a time, and while that suspension lasted, the law excused the non-performance.    When the law ceased to suspend, the obligation to perform revived, and performance then, within a reasonable time, was equivalent to exact performance.    *Hadley* v. *Clarke*, 8 *T. R.* 259 ; *Baylies* v. *Fetty Place*, 7 *Mass.* 325 ; *Catin* v. *Insurance Co.*, 2 *Wash. C. C. R.* 317.

The law was the constitutional act of the government, to which both plaintiff and defendant owed allegiance.    It was therefore an act to which both of them were parties, for " every man is, in judgment of law, a party to the acts of his own government."    Government is the representative of the wills of all the people.    This is the theory of all governments, and the matter of fact in all free governments.    *Griswold* v. *Waddington*, 16 *Johns.* 438, 447 ; 1 *Kent's Com.* 55.

It is as if the plaintiff and defendant had, at the time of this suspension of commercial intercourse, agreed together, that inasmuch as it had become expedient for the purpose of suppressing insurrection, that payment on the day fixed should not be made, therefore payment should be postponed until the expediency ceased.    The government was the constitutional agent of both parties, for the purpose of determining what regulations and restrictions should be placed upon commercial intercourse, and what steps should be taken to suppress insurrection.    ( *U. S. Cons., Art.* 1, § 8.)    The rights of parties were held subject to the exercise of these powers of government, and liable to be affected so far as such exercise rendered necessary.    This act of the government was a temporary remission of the duty to pay, granted to the plaintiffs by the lawfully authorized agent of the defendant.    It was more, for it not only remitted the duty to pay, but it tem-

porarily forbade the payment. Certainly, if the defendant had said to the plaintiffs, " You need not, you must not pay on the day named, our highest interests, the very existence of the nation that protects us, require that you should delay payment," this would have been a sufficient excuse, and when the agent of the defendant, authorized so to do, says this, the result must be the same.

But the excuse goes still further. Not only were the plaintiffs forbidden to pay, but the defendant is itself forbidden to receive. If the plaintiffs had come to New Jersey and tendered this premium to the defendant, the defendant would have been obliged to say, " We are *citizens* of New Jersey, and you are *citizens* of Virginia, and to receive this payment would be an act of commercial intercourse, and commercial intercourse is between us unlawful ; we cannot receive it." Such a legal incapacity in the defendant, is a sufficient excuse for not paying or tendering the premium, for if the tender be useless, it is not requisite. Suppose that on the day when the premium fell due, the defendant corporation had removed every officer and agent capable of receiving the payment, or had forbidden every officer and agent to receive it. Would not the plaintiffs be excused from payment or tender ? And yet this very incapacity, this very prohibition, results from the act of the government which represented the defendant, and to whose act the defendant was a party. Where the performance of the required condition becomes impossible by the act of the law, the plaintiff is entitled to recover, without showing a compliance with the agreement in this particular. *Jones et al.* v. *Judd,* 4 *Coms.* 411.

The following recent cases maintain and illustrate the principles relied on by the plaintiffs : *The Manh. Life Ins. Co.* v. *Warwick,* 20 *Gratt.* 614 ; *Robinson* v. *Int. Life Ass. Co.* 42 *N. Y.* 54 ; *The N. Y. Life Ins. Co.* v. *Clopton,* 7 *Bush* 179 ; *Hamilton, ex rc.* v. *Mut. Life Ins. Co. of N. Y. U. S. Dist. Ct. South. Dist. of N. Y., Dec.* 1871.—*Blatchford, J.*

The following language of the judge in the case in 20 *Gratt. p.* 634, is accordant with the rights of parties and the true policy of the nation, and contains the correct principles of law.

" When the contract is made before the war, but not executed by either party, and the carrying it into execution would involve a violation of the duties of the parties, respectively, to their country in the new relations which war has created; in that case, its execution not having been entered on, and it being uncertain how long the war may last and prevent the execution of the contract, it may be dissolved; and this not to the prejudice of the parties but for their presumed convenience and benefit. * * * * On the other hand, if the contract is partly executed, and rights under it have vested, and it cannot be dissolved without the loss or forfeiture of one of the parties, and it cannot be carried into execution consistently with the duties of the parties to their countries, respectively, while the war lasts; in such case it should not be dissolved, but only suspended."

The judgment in this case having been rendered for the amount which the parties have agreed the plaintiffs should recover, if they are entitled to judgment at all, should be affirmed.

The opinion of the court was delivered by

BEDLE, J.   This suit was brought upon a policy of life insurance, issued by The Mutual Benefit Life Insurance Company, a corporation of this state, on December 27th, 1849, for $5000, upon the life of John H. Hillyard, then and continuously afterwards, up to his death, a citizen and inhabitant of the state of Virginia.   He died June 1st, 1862.   The annual premium was $302.50, which amount was regularly paid each year, up to and including December 27th, 1860. The premium of December 27th, 1861, was not paid, by reason of the insurrection and condition of hostilities then existing in that part of the state of Virginia, where Hillyard and those for whose benefit the insurance was effected, resided;

but as soon as such hostilities were terminated, that premium, with lawful interest, was tendered to the company, and by it refused. By the policy, the company, in consideration of $302.50, paid at the date thereof, and of the annual premium of $302.50, payable on December 27th of every year during the life of Hillyard, agreed to pay $5000, the sum insured, within ninety days after notice and proof of death, subject to certain conditions, and among them, in substance that, in default of the payment of any of the annual premiums on the days mentioned, the company should not be liable to pay the sum insured, or any part thereof; and that the policy should cease and determine, and all previous payments and profits thereupon be forfeited to the company.

The main question involved is, as to the effect of the recent civil war upon the policy—whether the payment of the premium was suspended merely, or the policy avoided. No argument can be drawn from the hardship of either view. It is undoubtedly important that life insurance companies should promptly receive their premiums, and clauses to secure that result will be strictly enforced, as in the case of *Catoir* v. *American Life Insurance Co.*, 4 *Vroom* 487; but, at the same time, when such an unexpected event as a civil war between the states occurs, it is equally important to know whether the insured, if unable to pay the premium by reason of that, shall lose all benefit from the insurance, and forfeit to the company the whole amount paid, which may, as in this case, including principal and interest, nearly equal the sum insured. It is an injury to the company not to receive prompt payment, but it would be a greater injury to the insured to lose all benefit from the insurance. War always creates hardships, and private rights must necessarily suffer from the hostile condition; but the evident object and tendency of judicial action is, where the government has not created forfeitures, and where the question is one of the mere effect of the war *ipso facto* upon private contracts and interests, to interfere with them only so far as may be rendered necessary by the existence of hostilities, and when, to preserve them, would be

inconsistent therewith. It would be impossible to so declare the law as that no injury would result, but it should be the purpose of the court, as far as consistent with principle, to sustain the interests of both parties, the one as well as the other, in the policy, doing as little injury as possible to either. The difficulty in this case arises from the non-payment of the premium of December 27th, 1861. In an ordinary case, the policy would be forfeited, according to its terms ; but if unlawful to pay the premium when due, by reason of the war then existing, the question to be settled is, how such state of war, or the non-payment for that cause, affects the contract. It cannot be disputed that the existence of the war, taken in connection with the proclamation of the President of August 16th, 1861, and the act of Congress of July 13th, 1861, which authorized the proclamation, suspended all amicable intercourse, and made it unlawful then to transmit the money for the premium from the insurrectionary state to this. That doctrine arises out of the *fact* of all wars, whether foreign or civil ; but, in addition to that, the clear effect of the proclamation, with the force and authority of section 5 of the act of congress, was to make it incontestable that, during the insurrection, intercourse necessary to transmit money, was suspended. The transmission of money, among other consequences, involves intercourse inconsistent with a condition of hostilities, and therefore it was unlawful to remit it, and by the evident force of the act of congress alone, after the proclamation, it was unlawful to receive it as the result of any intercommunication between those of the belligerent states. How then was the contract of insurance affected by the non-payment of the premium for that cause, or by the war ? The only ground upon which it can be claimed that the war *ipso facto*, dissolved the contract is this : That to make the annual payments, involved an act contrary to the laws of warfare, and that act in this case consisting chiefly in the intercourse necessary to accomplish it, which would be unlawful. It is granted that to transmit the money, would be unlawful, but the result sought does not follow from that alone. War does

not defeat a debt, yet the right to collect it during the continuance of the strife, is suspended, and the creditor looses his interest. Let us analyze the case of a debt due, as for instance, for goods sold before the war, but payable at a time after its commencement, and to make the illustration as forcible as possible, payable at different times by instalments during the war. The actual contract is, the debtor having received the goods, that he shall pay for them at the times appointed. In the absence of hostilities, it is the right of the creditor to receive and the duty of the debtor to pay, but war having occurred, the debtor cannot discharge that duty without an infraction of law. Any attempt to do it would be an act clearly inconsistent with the state of war, but the debtor is not discharged for that reason. The debt should be paid by the contract; the contract itself requires it, yet the payment may be suspended and the debt subsist, and it is so with any executed contract not obnoxious to the policy of warfare. Rights vested under it will be saved, but any immediate benefit is suspended. If the contract could be carried out by any *hocus pocus* action in making the payment of the several instalments, it would still be unlawful to do it, for the law does not require or tolerate any such irregularity, and therefore suspends the payment, leaving the claim disturbed as little as possible, and although the creditor must submit to the loss, yet he is allowed as much benefit from his contract as is consistent with the state of war. It will thus be seen that it does not necessarily follow that when the contract itself requires payment, the contract will be entirely dissolved. The law strips the contract of its objectionable features and leaves the rest intact. There is a class of contracts, however, upon which the war works a complete dissolution, and among them are those termed continuing. They are of an executory nature merely, and where the contract in its essential features, if it subsists, must violate the law governing hostilities. The chief instance is a partnership. It is undoubted that no contract can be made during belligerency, and although a contract of partnership is made before the war, yet it contemplates

the continuous performance of acts amounting to distinct contracts.    The life of a partnership is in the continuance and performance of the transactions it contemplates.    Without that the relation would be barren.    It is of the nature of a partnership that there should be intercommunication of the partners ; each also, is interested in the business and is affected by the acts of the other, and as stated by Chancellor Kent, in the great case of *Griswold* v. *Waddington*, 16 *Johns.* 494, " when one of the parties becomes disabled to act, or when the business of the association becomes impracticable, the law as well as common reason, adjudges the partnership to be dissolved."    Hence the agreement of partnership is not suspended, but dissolved.    Although a contract of partnership is dissolved, yet, as to all transactions executed before the war, there is no rule of law requiring a forfeiture of the profits to the partner who happens to possess them. The remedy to collect them during the war would be suspended, yet the right to them remains.    But this contract of insurance is not of the exact nature of a debt, nor is it of the character of a partnership.    It is peculiar.    If the premiums had all been paid previous to the war there would have been only a debt, payable at death, an event certain to happen, and if Hillyard had died before the premium of December 27th, 1861, had accrued, there is no reason in the policy of the law, or in plain justice, why, after the war, the sum insured could not have been collected.    A mere contract of life insurance, subsisting at the breaking out of the war, without requiring the performance of an act inconsistent therewith, and especially with a clause, as in this, against entering into the military or naval service, is not in itself antagonistic to the laws governing a state of war, and, as already said, if it is to be condemned it must be upon the ground that it contains provisions for the payment of premiums which, if strictly carried out, would be antagonistic. How, then, should the law deal with this contract containing such provisions ; shall the payments be suspended or the policy avoided ?    For the present I disregard the question

of condition precedent, for that is confined to the mere interest of the parties, while this depends chiefly upon considerations of public policy. It is sufficient now to say, that on the payment of the first premium a right became vested in the continuance of the contract of insurance, but on condition that the premiums be promptly paid. The contract was executed to the extent that the premiums were paid, and the right thereby acquired was private property. It is the policy of all enlightened governments not to confiscate debts and credits, although the power to do it exists. 1 *Kent* *65; *Brown* v. *United States*, 8 *Cranch* 110; *Hanger* v. *Abbott*, 6 *Wall.* 532. Chief Justice Marshall, in Brown v. United States, assumed it to be the universal practice not to exercise the right. This contract is of the general character of debts and credits, and the policy of the government would be to leave the interest acquired under it undisturbed by any act of confiscation. There is also a policy in the law, which is careful of private rights, and it is not confined to times of peace. When the dread necessities of war break up all friendly intercourse, disturbing and destroying trade, commerce, property and life itself, it is still the policy of the law to save from wreck and loss all private property and rights possible to be saved, consistent with the stern demands of the hostile state. The reason why contracts or transactions between belligerents are interdicted is, that they are in violation of the doctrine that all commerce, friendly intercourse, and trading with the enemy, are contrary to the nature of a state of war, but the destructive power of the interdiction should not be carried farther than necessary to enforce the doctrine. There is no reason why *ante bellum* contracts, not entirely executory, should not be preserved from dissolution, to the extent that they are not inconsistent with the duties and requirements of a condition of hostilities. The test to dissolve a pre-existing contract is its essential antagonism to the state of war. It is so in partnerships; it is also so in contracts of affreightment. But if rights have been acquired under a contract, not substantially antagonistic, the law will either abridge or qualify it, or sus-

pend its performance, in whole or in part, according to the nature of the contract. These are analogies to that effect. It is unlawful to insure enemies' property, yet a policy of that kind issued previous to a war may be qualified so as to save it from entire destruction. The case of *Furtado* v. *Rogers*, 3 *B. & P.* 191, (1792,) was an insurance effected in Great Britain, on a French ship, previous to the commencement of hostilities between Great Britain and France. The policy was in the usual form, including an insurance against captures. The ship was captured by *British* force. The court held "that when a British subject insures against captures, the law infers that the contract contains an exception of captures made by the government of his own country, and that if he had expressly insured against British capture, such a contract would be abrogated by the law of England." The court also said that the plaintiff was "not entitled to a return of the premium, because the contract was legal at the time the risk commenced, and was a good insurance against all other losses but that arising from capture by the forces of Great Britain." In that case the court did not consider the contract dissolved, but that it was subject to a qualification that it should not apply to British captures. To the same substantial effect are the cases of *Kellner* v. *Le Mesurier*, 4 *East.* 396 ; *Gamba* v. *Le Mesurier*, 4 *East.* 407.

In *Brandon* v. *Curling*, 4 *East.* 410, a kindred case, Lord Ellenborough, Chief Justice, after referring to the two Le Mesurier cases, says: "It follows, as a consequence of the same principle, that wherever the generality of the terms of assurance might, in their actual application to the covering of any particular risk, produce, if effect were given to them in their extended sense, a similar contravention of public interest, the insurance must be construed in such a manner as to exclude the particular event or peril, which could not be so made the subject of a legal insurance in direct terms by a British underwriter." He gives two instances of implied exceptions, that may arise in the application of general words of insurance; one of which is, that where an insurance is upon goods generally, a proviso shall be considered engrafted, as follows :

" Provided, that this insurance shall not extend to cover any loss happening during the existence of hostilities between the respective countries of the assured and assurer;" and the other is, that "the risk of *detention of princes*, &c., must be understood to be restrained and qualified by an implied proviso, " *that it shall not extend to cover any loss happening in the course of any contraband adventure, in which the goods would become liable to seizure as forfeited by the laws of this country.*" These cases are referred to merely to show how contracts may be restrained or qualified, when, to carry them out according to the full scope of their terms, would be unlawful.

An instance of suspension of agreement exists in the case of a debt already alluded to. Another is in the suspension of a clause in a policy of insurance fixing a time within which suit must be brought. *Semmes* v. *Hartford Insurance Co.*, 13 *Wall.* 158. In that case the Supreme Court say : " We have no doubt that the disability to sue, imposed on the plaintiff *by the war*, relieves him from the consequences of failing to bring suit within twelve months after the loss, because it rendered a *compliance with that condition impossible*, and removed the presumption which that contract says shall be conclusive against the validity of the plaintiff's claim." See, also, Hanger v. Abbott; also, *U. S.* v. *Wiley*, 11 *Wall.* 508 ; *The Protector*, 9 *Wall.* 687. In *Parsons on Contracts*, Vol. 2, p. 187, the author states that " a law may have the effect of suspending an agreement that was originally valid, and which it makes impossible without violation of law, and yet leave the contract so far subsisting that upon a repeal of the law, the force and obligation of the contract remains." See, also, *Baylies* v. *Fettyplace*, 7 *Mass.* 325 ; *Hadley* v. *Clark*, 8 *T. R.* 259. In a Mississippi case, *Statham* v. *New York Life Insurance Co.*, 45 *Miss.* 581, found also, in 3 *Bigelow, Ins. Rep.* 650, a part of the opinion of Simrall, J., contains so much good sense on this subject that I will quote it : " As a general proposition, war suspends the performance of *ante bellum* contracts and denounces as illegal and invalid those made *pendente bello*. If an *ante bellum* contract is dissolved at all, it

is because its performance is inconsistent with the duties and allegiance which the parties owe to their respective countries, and involves some violations or infringement of these, and which has not been performed in whole or in part by either party. The annihilation of such a contract would not be injurious to either party, but would rather dissolve their inconvenient relations. But if the contract has been partly executed by one party by parting with money or other valuable things on the consideration and promise that the other will perform his part of the engagement, it would be gross injustice and repugnant to reason that intervening war should destroy the contract, devolving all the loss upon one party to the gain of the other. Nor should that be so unless an overruling policy should so require, &c. If the contract may be preserved or performed without the transmission of money or property from one enemy to the other, or without their intercourse or correspondence, then no principle of law or policy, arising out of a state of war between their respective countries, would demand an abrogation of the contract or its non-performance." In that case it was held that the contract could be performed by payment of the premium to an agent of the New York Company, residing in Mississippi, where the insured lived. In *Buchanan* v. *Curry*, 19 *Johns.* 136, the defendant was an alien enemy of the United States, residing in Canada; one of the plaintiffs was a naturalized American citizen residing in New York state, and the other was also a British subject in Canada. The contract was for the delivery of timber, but made before the declaration of war in 1812. Some of the timber was delivered before the war. The places of delivery were so general that the plaintiffs could elect to deliver the timber in Canada or within the United States. It was held that the contract was not dissolved by the war and that the plaintiffs could deliver the timber to an agent who resided in the United States, in performance of the contract.

The tendency of adjudication is to preserve and not to destroy pre-existing contracts. Where performance can be

had, without contravening the laws of war, the existence of the contract is not imperiled, and even if performance is impossible the contract may still, when partly executed, be preserved by engrafting necessary qualifications upon it, or suspending its impossible provisions, if made so by the act of the law. If the contract in question can be saved while the war lasts, it should be; and it is clear to my mind that the law will allow a suspension of the payment of the premium, and permit the payment to be made on the return of peace, with proper interest, unless there is something in the terms of the contract to prevent it. There is no more hardship in that than in suspending the payment of a debt. There is more in the latter, for the creditor looses his interest; but the insurance company will receive it, as is right. The company should receive it, because its ability is sustained by its premiums, and the interest accumulations. The nature of the contract is such that, when enforced, the equivalent for the sum insured should be made up. There is no question raised, in this case, as to the amount of interest tendered. The declaration states that legal interest was tendered. If compound interest could be required, as perhaps it ought to be, the company would be reimbursed for the delay.

But it is said that the payment of premiums is a condition precedent, and, if not made with exactness, that there can be no excuse for it unless specially provided in the policy. It is difficult to define the precise nature of the condition for the annual payments. The contract is *sui generis.* It may be admitted that the payment of the premium is a condition precedent to any recovery, the same as the performance of an entire contract may be, but the payment after the first is not a condition precedent to the vesting of substantial rights, under the contract, although liable to be defeated by force of the clause of forfeiture. The payment of the first premium covers the whole lifetime, and makes a complete vested right to the sum insured, if death takes place before another premium is payable, but if not it is subject to the payment of further premiums. This is not in the nature of a condition

precedent to the vesting of a title to real estate. In such a case, if the condition becomes impossible to be performed, nothing vests, because the instrument creates no right at all without the complete performance of the condition. A condition, as affecting real estate, where its nature is most distinctly seen, if precedent, must be performed before any estate vests; if subsequent, it divests an estate vested. If the condition precedent is void or impossible to be performed, nothing vests. If the condition subsequent is void or impossible, the estate, having vested, remains undisturbed. The condition in question cannot, in any technical sense, be regarded as precedent or subsequent, so as to vest or divest rights under the policy. It is a condition in the contract, and a part of it, and peculiar, and arising out of the very nature of life insurance contracts. The policy is necessarily of the character of mutual agreements, partly executed on one side, and although the performance of some on the part of the insured may be precedent to the final performance by the company, yet we should subject it to the same restraints and influences of the law as any other contract. When the first premium is paid a full contract of insurance is completed, subject to conditions peculiar to that class of contracts. The use of the words *condition precedent*, Baron Martin, in a certain case, (*Bradford* v. *Williams*, *L. R.*, 7 *Exch.* 261,) said he thought unfortunate; that "the real question, apart from all technical expression, is, what in each case is the substance of the contract." So far as the precedent payment of the premium in arrear is concerned it would, of course, have to be made before recovery. Time, also, is of the essence of the contract, and no fault or neglect of the party could excuse a non-payment ; but why should not this, like any other contract, be subject to such qualifications and conditions as the law may impose ? I am unable to discover any reason. This should have no immunity from the fate of every other contract, when, by an unexpected event, it becomes unlawful literally to carry it out. This subject, as we are now considering it, is free from any question of public

policy, and cases excusing performance according to contract, by reason of a subsequent unlawfulness, are in point. In *Baylies et al.* v. *Fettyplace et al.*, 7 *Mass.* 325, the plaintiffs sold, in 1807, sugar to defendants at Boston, for which defendants promised to pay two several sums at different times, and to deliver within a reasonable time what were called certificates of debenture of the United States. These were to be issued by the government officers, and could not be obtained unless the sugars were exported. Within the reasonable time necessary for exportation, an embargo was laid by the United States. The court held that the embargo operated as a temporary suspension of the performance of the contract. Sewell, J., said that "the mere suspension of the exercise of this right operated equally upon the plaintiffs and defendants ; was created by laws to which both were parties, and formed a part of that system of regulation to which they had referred themselves in the implied intentions, if not in the express letter of their contract." Sedgwick, J., said : "The defendants were, of course, prevented inevitably, and without any fault on their part, from performing their promise. Now it is clearly settled, by innumerable authorities that, whenever a contract which was possible and legal at the time it was made, becomes impossible by the act of God, or illegal by an ordinance of the state, the obligation to perform it is discharged, or if such ordinance be temporary, the obligation is suspended during its continuance. (See references in note to that case.) In *Hadley* v. *Clarke*, 8 *T. R.* 259, in Court of King's Bench, where defendants contracted to carry the plaintiffs' goods from Liverpool to Leghorn. On the vessel arriving at Falmouth, in the course of her voyage, an embargo was laid on her until the further order of council—held, that such embargo only *suspended*, but did not dissolve the contract," and that where the embargo lasted two years. In *Jones* v. *Judd*, 4 *Coms.* 412, the plaintiffs made a sub-contract to do work upon a canal in New York. Afterwards, the legislature passed an act which put an end to the original contract and the sub-agreement. The defendant had paid plaintiffs for all

the work done, except ten per cent., which was not to be paid until the final estimate—*held*, that as the plaintiffs were prevented by authority of the state from completing their contract, they were entitled to recover.   The act of the legislature excused the performance of the condition precedent of entire performance.   The following are cases and references in the same direction as those cited : *Anglesca* v. *Rugeley*, 6 *Ad. & El.* (*N. S.*) 107 ; *Esposito* v. *Bowden*, 7 *E. & B.* 763 ; *Chitty on Contracts* 804 (10 *Am. ed. ;*) 2 *Parsons on Contracts* (1*st ed.*) 187.

Warranties in contracts of marine insurance are always regarded as most imperative in their performance, yet *Arnold*, in *Vol.* 1, *p.* 585, of his valuable book on *Insurance*, says : " It may be stated generally, that compliance with a warranty will be dispensed with, if it be rendered unlawful by a law *enacted since* the time of making the policy."   The foundation of this doctrine is in the maxim that " the law does not seek to compel a man to do that which he cannot possibly perform ;" and, as an illustration of it, the familiar instance is given in the books that, " if H covenants to do a thing which is lawful, and an act of Parliament comes in and hinders him from doing it, the covenant is repealed." *Broom's Max.* 168.   Although the instance is of a repeal of a covenant by the effect of an act of parliament, which is permanent, yet the principle is fairly deducible from it, that if the act interdicted is only temporarily unlawful, it suspends the operation of the covenant.   *Cohen* v. *N. M. Life Ins. Co.*, 50 *N. Y.* 610.

It must be considered in analogy to the marine insurance cases that there is engrafted by necessary force of the law upon the policy, a proviso or exception, saving it from forfeiture or extinction by suspending the payment of the premium, when by an unexpected condition of affairs it has become temporarily unlawful to make it.   The contingency of a civil war could not by any possibility have been anticipated at the making of the policy, and it would be grossly unjust to allow a forfeiture, when by suspending the payment,

the contract could afterwards be substantially performed. The law, in my judgment, will save the policy from so disastrous a result. The basis of all the argument against this view, so far as adjudication is concerned, is the case of *Paradine* v. *Jane*, *Aleyn* 26. The comments of the Chief Justice upon it are forcible. It was a case of *hardship* only, not of impossibility of performance. The exact language of the report cannot fairly be construed against the principle now insisted on. It is as follows : "And this difference was taken, that where the law creates a duty or charge and the party is disabled to perform it without any default in him and hath no remedy over, there the law will excuse him. As in the case of waste, if a house be destroyed by tempest or by enemies, the lessee is excused. So of an escape. So in 9 *E.* 3, 16, a supersedeas was awarded to the justices, that they should not proceed in a cessavit upon a cesser during the war, but when the party by his own contract creates a duty or charge upon himself, he is bound to make it good if *he may*, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract. And therefore if the lessee covenant to repair a house, though it be burnt by lightning or thrown down by enemies, yet he ought to repair it." The point of the second proposition is, "if he may." He must, *if possible*, however hard. The impossibilities recognized by the law are impossibility by act or force of law and impossibility by the act of God. It is unnecessary in this case to deal with the latter excuse, as there is more difficulty about it, but as to the former, it is said in *Chitty on Contracts* 804, "that the non-performance of a contract will always be excused where it is occasioned by act of law or by an act done by public authority." The doctrine already considered, would apply to a case where the disability was only on the part of the party to perform, but in the case before us, the company could not receive the payment without a violation of the law on their part. To do so would necessitate an act of intercourse. Hence both parties were under a legal disability—one to pay, the other to receive.

This is the effect of the act of congress and of the state of war. The right of those interested in the policy to pay and save the insurance was just as strong as the right of the company to receive. Neither could enjoy the right. By what principle then can the company exact a strict compliance with the clause to pay at a definite time? The hands of each were tied, and the company could not complain of the others default. According to all analogy and principles, the performance must be suspended under such circumstances. To dissolve, when the contract is part executed, would not place the parties in a just position; but to suspend will best reach the intention and spirit of the contract.

The suggestion that this being a mutual company the contract is therefore like a partnership and dissolved, is disposed of by what Allen, J., said in substance in *Cohen* v. *N. Y. Mutual Life Insurance Co.*, 50 *N. Y.* 624, that the company is a body corporate, capable of contracting as such, and the relation is between insurer, a corporation, and insured; that the members are not partners between themselves. The contract is the contract of the corporation, and whatever incidental advantages appertain to a member, that that does not affect the contract in the policy. Besides, if a partnership, it would result in an accounting as of the time of dissolution, which would be at the commencement of the war, and the defendant would hardly desire that result.

The further suggestion by defendant's counsel that the fault of non-payment must be imputed to the plaintiffs, because the rebellion was their fault, cannot be regarded. The law deals with the condition of things when actual hostilities exists, and considers all the citizens of the belligerent districts as enemies mutually. The causes of the contest are swallowed up in the strife, and the legal results of it, between individuals, are not affected by the causes which induced it. If this insurance company had been located south and the plaintiffs north, the law would affect them the same as it does now with their present status.

The questions involved in this cause have greatly agitated the courts of this country, and resulted in adverse decisions. I have not reviewed them, but will content myself with merely a reference to them, both in favor of the result reached, and those adverse. In favor: *N. Y. Life Ins. Co.* v. *Clopton,* 7 *Bush* 179 ; *Manhattan Life Ins. Co.* v. *Warwick,* 20 *Gratt.* 611 ; *Robinson* v. *Internat. Life Assurance Co.,* 42 *N. Y.* 54 ; *Statham* v. *N. Y. Life Ins. Co.,* 45 *Miss.* 581 ; *Hamilton* v. *Mutual Life Ins. Co.,* 9 *Blachf.* 234 ; *Cohen* v. *N. Y. Mutual Life Ins. Co.,* 50 *N. Y.* 610 ; *Sands* v. *N. Y. Life Ins. Co.,* 50 *N. Y.* 626. Adverse : *Dillard* v. *Manhattan Life Ins. Co.,* 41 *Ga.* 119 ; *O'Reiley* v. *Mutual Life Ins. Co.,* 2 *Abb. Pr.,* *N. S.* 167 ; also *Tait* v. *N. Y. Life Ins. Co., in U. S. Circuit,* *Western Tennessee* (1873.) *also at Crane 372*

In addition to these cases, the recent action of the Supreme Court of the United States, in affirming, by a divided court, two adverse judgments, exhausts all the adjudication I can find upon the distinct subject.

The objection that the suit is not brought in the name of the proper party, is correctly disposed of by the Chief Justice, and nothing further need be said upon it.

The judgment of the Supreme Court must be affirmed.

THE CHANCELLOR (dissenting.) The declaration states that, on the 27th of December, 1849, the daughters of John H. Hillyard, now deceased, then of Richmond, in Virginia, the survivors of which children, with the husbands of such of them as are married, are the plaintiffs in this suit, by Edwin Hillyard, their " trustee and agent," made and entered into a certain agreement (a policy of insurance) with the defendants, whereby the company, in consideration of $302.50, to them paid, by Edwin Hillyard, trustee, and of the annual premium of $302.50, to be paid on or before twelve o'clock, noon, on the 27th day of December, in every year during the continuance of the policy, assured the life of said John H. Hillyard for the term of life, payable, in trust, to said Edwin Hillyard, trustee, for the benefit of the above mentioned

children of John H. Hillyard ; that the company thereby promised and agreed to, and with the assured, his executors, administrators, and assigns, well and truly to pay, or cause to be paid, the sum insured, to the said assured, his executors, administrators, or assigns, within ninety days after due notice and proof of the death of said John H. Hillyard, deducting therefrom all notes taken for premiums on that policy unpaid at that time.   The policy contained certain provisos, among which was the following : In case the said Edwin Hillyard, trustee, should not pay the said annual premium on or before the several days hereinbefore mentioned for the payment thereof, then, and in every such case, the company shall not be liable to the payment of the sum insured, or any part thereof; and this policy shall cease and determine. The annual premiums were paid up to December 27th, 1861, but the one which then became due was not paid.   John H. Hillyard died June 1st, 1862.   After his death, and after the condition of hostility between the part of the country in which he resided and the federal government ceased, the premium due on the 27th of December, 1861, was tendered, but refused.

This case comes before us on demurrer to the declaration. The plaintiff in error insists that the action cannot be maintained by the plaintiffs therein, but should have been brought in the name of the trustee.   I consider it enough to say, on this head, that the declaration avers that the agreement for life insurance was made by them through Edwin Hillyard, not only as their trustee, but as their agent.   If made by him as their agent, they, as principals, may, of course, maintain an action upon it.

The main subject of consideration is, whether the action can be maintained, in view of the fact that the declaration admits that no annual premium was paid on the policy after the 26th of December, 1861, and alleging no release or waiver, seeks to excuse the non-payment on the ground of the existence of the governmental interdict which was issued during the civil war.   The question is, whether this excuse will avail—a question which the conflicting decisions of the

courts on the subject leave so entirely open as to compel us, for want of authoritative adjudication, to seek a conclusion by the guidance of legal principle. The question is one of law, merely, from which all considerations foreign to the discussion must be excluded. The plaintiffs have sued in a court of law for the insurance money. Their claim is based on the contract between them and the company, and, by the construction of that contract, according to legal principles, they must abide. The company have the right to such a construction of their agreement.

The cases which have come to my notice, in which this subject has been discussed, are: *Manhattan Life Ins. Co. v. Warwick*, 20 *Gratt.* 614; *New York Life Ins. Co. v. Clopton*, 7 *Bush* 179; *Dillard v. Manhattan Life Ins. Co.*, 44 *Ga.* 119; *Statham v. New York Life Ins. Co.*, 45 *Miss.* 581; *Cohen v. New York Mutual Life Ins. Co.*, 50 *N. Y.* 610; *Sands v. New York Life Ins. Co.*, 50 *N. Y.* 626; *Hamilton v. Mutual Life Ins. Co., of New York*, 9 *Blatch.* 234; *Tait v. New York Life Ins. Co., Circuit Court U. S. for the Western District of Tenn.;* and *O'Reily v. The Mutual Life Ins. Co. of New York*, 2 *Abb. Pr. N. S.* 167.

None of them, except Dillard *v.* Manhattan Life Insurance Co., presented the exact features of the present case. Here no tender of the unpaid annual premium to the agent of the company in rebel territory, when it became due, is averred. Here the death of the person insured occurred before tender to the company. This is not a suit to rehabilitate a policy on equitable grounds, in the lifetime of the person insured, but an action to recover the insurance money on a claim of loss. No question of agency is presented here, nor of the validity of any disputed payment. In Manhattan Life Insurance Co. *v.* Warwick, the payments of annual premium were made up to 1861, and receipts given, signed by an officer in New York, and countersigned by an agent in Richmond, to whom the money was paid. In 1861 the premium, then due, was paid to that agent, but only his receipt given for it, and the company did not receive it. In 1862 the insured offered

to pay the premium then due, to the agent in Richmond, but he declined to receive it, the company having given him directions that the premiums must be paid in New York. The person whose life was insured died in 1862, after this last tender. It was held that the company was liable to the insured for the amount of the insurance, less the amount of the last premium which he had not paid, and that the war did not revoke the agency in Virginia. In New York Life Insurance Co. *v.* Clopton, there was a tender to the company's agent, in Virginia, of the premium for 1862, punctually when it was, by the terms of the policy, payable; the tender, however, was in the local currency of that state, and the agent, considering it best for all parties, substituted for it a bond for the payment, with interest, at the end of the war. He had received all the previous premiums in that currency and had paid them over to the company without objection. The court held that his authority so to receive might be assumed by the assured, and that the fact that Virginia was the place of payment, might have implied that the currency of that state, at the time of payment, however it might then have been changed and depreciated, would have been received by the company. The court adds: "But, however this may be, as the appellant (the company) could not have lawfully collected the premium, and may have lost it by insolvency or confiscation, had it been paid to Garland (the agent,) the tender as made, and the substituted bond, as executed, may be regarded as equivalent to actual payment, and may have been as beneficial to the appellant, and by its security even more so. The refusal to accept the tender for the year 1862 dispensed with a formal repetition for the years 1863 and 1864;" (the person whose life was insured died in the last named year;) "and, moreover, we may infer, from Garland's testimony, that bonds were given for those years, also. On these facts we cannot say that the literal non-payment of the three last premiums was either voluntary or prejudicial, or was ascribable even as much to the appellees as to the appellant. And, so understanding the phase of the case and the attitude of the parties,

we cannot, consistently with the spirit of the contract and equal justice to the parties, adjudge the policy void."

In Dillard v. Manhattan Life Insurance Co., the annual premiums had been paid from 1859 to 1862, and from that time till 1865 no premiums were paid, the assured residing in rebel territory. In February of the last mentioned year the person whose life was insured died. After the war had terminated the unpaid premiums were tendered and refused. It was held that the tender was ineffectual. In Statham v. New York Life Insurance Co., the company had, at the outbreak of the war, an agent in Mississippi, who remained during the war. It was held that the war did not revoke the agency, nor make it unlawful for the agent to receive premiums, which were tendered, and that a payment to him would have been a discharge of the premium, and that a tender to him of the premium due December 8th, 1861, (the person whose life was insured died in 1862,) saved the assured from being in default as to the payment of premiums. In Cohen v. New York Life Insurance Company, it was held that the non-payment of the annual premiums falling due during the war, was legally excused by the fact of the disability arising from the war, and that the tender, after the war, revived the policy. In this case, there had been no loss, and the action was in equity, the relief prayed being that the assured might be permitted to make payment of the unpaid annual premium and that the policy might be declared valid, or that the company might be compelled to pay back to the plaintiff, all sums paid upon the policy, with interest, and all dividends declared under the policy, &c. The cause came before the court on demurrer. In Sands v. The New York Life Insurance Company, the annual premium had been paid by the assured to the company's agent in Mobile, up to 1862, and on the day in that year when the annual premium became due, (January 18th,) the assured paid to the agent there, the premium in confederate notes, which the agent accepted as cash, as and for the premium which fell due on that day. The person whose life was insured died in July of that year. It was

held that this was a valid payment.    In Hamilton *v.* Mutual Life Insurance Company of New York, the action was in equity for the same relief, under the same circumstances prayed in Cohen *v.* New York Life Insurance Company, and with like result.    In Tait *v.* New York Life Insurance Company, the assured, in the first year of the war, made a tender to a person who was, up to the beginning of the war, the company's agent in Memphis, of the annual premium which fell due in that year, and the tender was made on the day the premium fell due, but the tender was refused.    The court held that the policy was unlawful as indemnifying a public enemy against loss in time of war, and that such a policy, where entered into before hostilities, is abrogated when they occur ; that the relations it established were illegal between belligerents ; that where a life policy provides that it shall be void upon the non-payment of premiums within the time prescribed, such payment is a condition precedent and that time is as of the essence of the contract; and that there can be no recovery if punctual payment is not made ; that where the performance of a condition precedent becomes unlawful or by the act of God impossible, that will not authorize a recovery upon the contract without performance, and that the agency of one authorized to receive premiums and renew policies becomes unlawful when the insured and insurer become public enemies.    In O'Reily *v.* The Mutual Life Insurance Company of New York, the action was in equity to declare the policy valid and binding on the company, and that the assured might be reinstated in his rights in respect thereto, or that a new policy might be executed to him, &c. The court, (Superior Court of New York city,) denied the relief.    It appeared that the plaintiff paid the premiums up to the breaking out of the war to an agent of the company in Alabama, and after the war broke out he paid them to that agent there as they became due, and as soon as practicable after the close of the war in 1865, tendered the premium due that year to the company.    It is understood that a determination of the question now before us was prevented in the

Supreme Court of the United States, by an equal division of the justices in conference, and the consequence is, that the opposite judgments of the courts below in the two cases involving the question, stand affirmed. It will be perceived that in some of the cases above cited, there was an element which is not found in this case—payment or tender of premium, during the war, to an agent of the insurer—and in some of them relief was sought in equity, while as yet, the person whose life was insured, was living.

The payment of the annual premiums, according to the terms of the policy, was a condition precedent to the obligation of the company from year to year. The latter rested on the former. The company undertook to pay, on the death of the person whose life was insured, on condition, and only on condition, that the annual premiums were paid according to the stipulations of the policy in that behalf. It is part of the expressed consideration of their promise, and it is expressly provided by the policy that, in case of the failure to pay those premiums, the company shall not be liable to the payment of the sum insured, or any part thereof, and the policy shall cease and be at an end. In determining the character of a condition, whether it is precedent or subsequent, the question is, whether the conditional event is to happen before or after the principal. Here the conditional event is the payment to be made on the death of John H. Hillyard, and the principal, the payment of the annual premiums as they should become due. The principle is laid down in the second resolution in *Thorpe* v. *Thorpe,* 1 *Salk.* 171 : "Where a certain day of payment is appointed, and that day is to happen subsequently to the performance of the thing to be done by the contract, in such case performance is a condition precedent, and must be averred in an action for the money." "For," said the court, "every man's bargain ought to be performed as he intended it ; when he relies on his remedy it is but just that he should be left to it according to his agreement ; but, on the contrary, there is no reason that a man should be forced to trust when he never meant it." No argument is necessary to establish

so evident a proposition as that the company's obligation under such a policy as that in suit is predicated upon the payment of those premiums, according to the stipulation of the policy. In *Catoir* v. *American Life Ins. and Trust Co.*, 4 *Vroom* 487, 489, the court said on this subject, speaking in reference to such a provision in a policy of life insurance: "There can be no objection to a provision of this kind. It is salutary and wise for the solvency and success of corporations like the defendants. The insurance is accepted upon these terms. . They form part of the written contract upon which the claim for the benefit of it is based, and the plaintiff is bound to a strict performance of them, unless such performance is legally modified by the company." In *Howell* v. *Knickerbocker Life Insurance Co.*, 44 *N. Y.* 276, 284, the court said on the same subject: "Payment was a condition precedent to the continuance of the policy, and no mere accident or act of God, however controlling, could continue the policy in force after the pay day without payment. This could be done only by the agreement or consent of the defendant, properly given, or by some act which would estop the defendant from denying payment." The obligation of the company under the policy did not, by the payment of the first premium, or of subsequent premiums, become a debt, but a contingent liability merely; a liability to pay, provided the person whose life was insured should die before the next pay day, not having violated any of the conditions of the policy; a liability which would terminate in case that person should survive that day, and the annual premium, which then would become due, should not be paid. If this be the extent and condition of the company's obligation—if their liability to the assured was contingent, conditional—dependent upon the payment, by the latter, of the annual premiums as they should become due, they cannot be liable to him, unless he has done the thing which they stipulated with him should be done as a condition on which their liability was to depend, or they have waived or are estopped from denying performance. That such is the character, condition and

extent of the liability is thoroughly established. *Catoir* v. *Am. Life Ins. Co.*, *supra;* *Want* v. *Blunt*, 12 *East* 183 *; Howell* v. *Knickerbocker Life Ins. Co.*, *supra; Gamble* v. *Ins. Co.*, 4 *Irish Rep.*, *C. L.* 204 ; *Dillard* v. *Manhattan Life Ins. Co.*, *supra; Davison* v. *Mure*, 3 *Doug.* 28 ; *Worsley* v. *Wood*, 6 *T. R.* 710 ; *Campbell* v. *French*, 6 *T. R.* 200. To keep the policy in force, says Bunyon, (*Treatise on the Law of Life Assurance*, *p.* 66,) the renewal premium must be actually paid ; it is not sufficient that there was no intention to discontinue the policy, and that the office is not, in fact, damnified by the delay. The common equitable relief in respect of money payments does not apply, for the company has not the power of compelling the payment of the premium. *Tarleton* v. *Staniforth*, 5 *T. R.* 695 ; *S. C.*, judgment affirmed, *Exch. Cham.* 1 *B. & P.* 471 ; *Acey* v. *Fernie*, 7 *M. & W.* 151. The act of God will not excuse the default of performance of a contract of this character, absolute in its terms and making no allowance or provision for the act of God or other inevitable necessity. See, in addition to the cases above cited, *Trustees* v. *Bennett*, 3 *Dutcher* 513 ; *Thompson* v. *Dudley*, 25 *N. Y.* 72. If the assured fall dead with the money in his hand on his way to the office of the insurer to pay the annual premium, and so it remain unpaid beyond the time limited, the company is discharged from all liability under the policy. Though he may have paid annual premiums greater in their aggregate amount than the sum insured, nevertheless there is no remedy, nor can any recourse be had to the insurer in the premises. Hard as is this judgment, yet it is the dictate of that stern justice which regards with equal eye, the obligations of each of the parties, giving to each the advantage for which he has stipulated, but only on the terms on which alone he is entitled to it. It is impossible to shut our eyes to the fact that the bargain between the insurer and the insured, under this policy is, in its very essence, conditional. The company did not agree to pay in consideration of the promise of the assured, but in consideration of his performance. That is evident from the nature and character of the

contract. The assured made no promise at all. He was bound by no covenant to pay or to do anything. The company therefore had no remedy whatever against him. The contract was in this respect unilateral. Were this a case of mutual undertaking, the question whether the promise of the assured was the consideration for that of the insurer, or whether the performance and not the mere promise of the former, was the consideration of the promise of the latter, would be determined by the intention and meaning of the parties as it appears on the instrument, and by the application of common sense to the case. *Chitty on Contracts*, (11th Am. ed.) 1082; *Hotham* v. *East India Co.*, 1 *T. R.* 638; *Porter* v. *Shepperd*, 6 *T. R.* 668; *Campbell* v. *Jones*, 6 *T. R.* 571; *Morton* v. *Lamb*, 7 *T. R.* 130; *Shinn* v. *Roberts, Spen.* 435, 443. Nor can we fail to perceive the injustice of holding in such a case as this, the one party to the bargain after the consideration has failed, while the other is permitted to derive, at the expense of the former, all the advantages to which, by its terms, he would have been entitled only by a strict performance of its stipulations. It should be a hard necessity of inflexible and inexorable law which compels a court to such a judgment. It is not insisted in this case that such a result could be permitted to follow the failure of the assured to pay according to the agreement, if such a failure arose from the act of God; but it is insisted that the public interdict which forbade commercial intercourse between the assured and the company; which forbade the one to pay and the other to receive the annual premium, works an exception to the rule. The reason is not apparent. The interdict of the government would excuse performance of a covenant, and it would relieve from a forfeiture and from penalties and from payments, where time is not as of the essence of the contract; but such is not this case. The question here is not as to the liability of the assured for non-payment, nor whether he shall be relieved from a forfeiture or penalty, but whether the company are liable to him now that the condition on which alone they were to be liable by the terms of the contract, has

not been performed. The question is, whether the character of the contract is to be altered and its identity destroyed; whether from a conditional agreement it is by operation of law, to become, in effect, absolute and unconditional. The tender of the unpaid premium with the interest thereon, is a mere delusive formality, for the money, if accepted, is to be returned in the shape of the insurance money. The tender amounts merely to the expression of a willingness to allow the company to retain, out of the sum insured, the amount of the unpaid premium and interest. It makes no difference in reaching a conclusion on this subject, that many annual premiums have been paid. The matter is to be determined on legal principle. The law must be the same if only one premium had been paid, and it is hazarding nothing to say that the courts would shrink from a judgment which, in a case where a company had received only the first premium of perhaps $3000 on a policy of $60,000, should compel the payment of the latter sum, under circumstances such as this case, in other respects, presents. And yet, the principle would be precisely the same. The injustice would be only greater and more flagrant, because the amount of money would be larger.

It is said, however, that, notwithstanding its form, this contract may be regarded as one of mutual obligations. If this be conceded, it seems to me clear that it was a contract of a continuing character—one which required that something be done—the payment of annual premiums to keep it alive. I cannot agree to the proposition that the contract was executed on the part of the company when the first premium was paid. The position appears to me to be utterly untenable. As a continuing contract, the war put an end to it. The prohibition of war, in the language of Chancellor Kent, in *Griswold* v. *Waddington*, 16 *Johns.* 438, " reaches to all interchange, transfer, or removal of property ; to all negotiations or contracts, to all communication, to all locomotive intercourse, to a state of utter occlusion to any intercourse but one of open hostility ; to any meeting but in actual

combat." " Executory contracts," said the court, in *Hanger* v. *Abbott*, 6 *Wall*. 532, 536, " with an alien enemy, or even with a neutral, if they cannot be performed, except in the way of commercial intercourse with the enemy, are dissolved by the declaration of war, which operates for that purpose with a force equivalent to an act of congress." By the common law, if there were a contract with an alien, and while it was merely executory, a war broke out between Great Britain and the country of the alien, that would dissolve the contract. *Esposito* v. *Bowden*, 4 *E. & B*. 963 ; *S. C.*, 7 *E. & B*. 778. But, if the contract were executed ; if nothing remained to be done by either party, and a cause of action had accrued to the alien thereon, before the commencement of hostilities, the effect of this was held to be only to suspend the right of the alien to sue till the return of peace. *Flindt* v. *Waters*, 15 *East*. 260, 265. In that case, which was an action on a policy of marine insurance, Lord Ellenborough said : " The ground of our decision, in this case, will not at all clash with the doctrine laid down by the court in Brandon v. Nesbitt. The point there decided was, that the fact of the parties interested in the insurance having become alien enemies before the loss happened, might be pleaded to an action brought in the name of the British agent who effected the insurance ; and the court are disposed to confirm that doctrine. But the defence of alien enemies must be accommodated to the nature of the transaction out of which it arises ; it may go to the contract itself on which the plaintiff sues, and operate as a perpetual bar ; or, the objection may, as in a case of this sort, be merely personal in respect to the capacity of the party to sue upon it. Here the objection is taken upon the general issue, which is a plea of a perpetual bar, and if found against the plaintiff, would have concluded him forever, so that, though peace should be established to-morrow between the two countries, and the crown should not have interfered to seize the debt, yet on this plea in bar, the plaintiff would have been forever estopped to sue for his debt. But here the objection is only of a temporary nature ; the contract itself was

perfect at the time it was made ; the trade was with an alien
friend, which required no license, though one was obtained
*ex abundanti cautelâ.* The insurance, the loss and cause of
action, had arisen before the assured had become alien ene-
mies : when, therefore, they became such, it was only a tem-
porary suspense of their own right of suit in the courts here
as alien enemies. This, therefore, being only a temporary
disability on the part of the assured, and there being no per-
sonal disability in the plaintiff, their agent, to sue, he is not
excluded from his right to recover by this species of defence
set up under the plea of the general issue."

It is claimed, however, it may be remarked, that this con-
tract differs essentially from a contract of co-partnership, which
the war admittedly dissolves, in this, that the latter contem-
plates continual communication and association, whereas the
former requires only annual communication. I do not see on
what principle the distinction between communication which,
by the terms of the contract, is periodical, merely, and that
which, though in contemplation of law continual, is practically
only occasional, is based. If the war actually, by its dura-
tion, prohibits the parties from such periodical communica-
tion, and such communication is necessary to the existence of
their contract, the same reason would apply in the one case
as in the other.

If the condition of war, or the interdict of the government
made it illegal for the company to receive the premiums, in
common justice they must be held to be absolved from all
obligation for the performance of which they were dependent
upon those premiums. In *Brewster* v. *Kitchell*, 1 *Salk.* 198,
Lord Holt said that where a man covenants to do an act
which is lawful when the covenant is made, and the act is
subsequently rendered unlawful by statute, the covenant is
repealed. The condition of war and the consequent interdict
of the government, prevented the parties from continuing the
contract. They did more ; they deprived the company not
only of the annual premium, but, to a great degree at least,
of the power to protect themselves against violations of the

conditions of the policy. It is just to hold that the war destroyed a contract which put it out of the power of the parties to it to continue on the terms on which alone it was based, rather than to seek to uphold it, to the manifest detriment of the loyal citizen, who is in no wise in fault. It may be observed, that the opposite view not only disregards the character and elements of the contract, but casts upon the company the burden of presumptions to which they cannot be fairly subjected. The logic is : the war forbade the payment of the annual premium, therefore it is to be assumed that the assured would, but for that prohibition, have paid it ; that he was not only able, but willing to pay it. And if the war had lasted ten years, and the person whose life was insured had lived to the end of that period, the result would, of course, have been the same.

The war put an end to this contract of insurance, if not when it broke out, then at the time when its prohibition took effect upon it, which was when commercial intercourse between the parties became necessary to its existence or continuance —when that prohibition prevented the payment and receipt of the annual premium, payable on the 27th of December, 1861. It does not seem to me to be necessary, on principle, to hold that such a contract is dissolved by the breaking out of the war, but only when the prohibition of the state of war takes effect upon it to the disturbance of the relations of the parties to each other in reference to it. Though war puts an end at once to marine insurance upon a vessel of the enemy, for the two-fold reason that intercourse is forbidden, and the effect of the insurance is indemnity, and, therefore, strength to the enemy, the reason does not appear to be applicable to the case of a life insurance, contracted for before the war until the war affects the relation of the parties or disturbs the contract. · When the war thus prevented the payment of the premium, it deprived the company, *pro tanto*, of the means of providing the insurance money, and deprived the assured of the privilege of keeping up the policy and securing the continuance of the liability of the company to him. Up to that

date the contingent conditional liability of the company continued, and had John H. Hillyard died before the annual premium, payable in 1861, became payable, not having violated any of the conditions of the policy, it violates no principle to say that the company would have been liable to pay the insurance money, and it might have been recovered by suit after the return of peace. But the payment of that premium was a condition precedent, not only to the continuance of the liability, but to any liability, whatever, of the company beyond that day.

It is said, however, that the late war was not between independent nations, but was a rebellion—an insurrection merely—and that the strict rules applicable to war between independent countries do not apply to it, and, therefore, the act of the government may be pleaded merely as creating an impossibility of performance, so that the question whether such impossibility will excuse, may be considered unembarrassed by the rules governing the people of independent countries at war with each other. It has been repeatedly authoritatively held that the late war was a public war between governments and all the inhabitants of the loyal states and those of the rebellious states, and that the people of each occupied the position of enemies to the people of the other during the continuance of the war. *The Prize Cases*, 2 *Black* 635 ; *Mrs. Alexander's Cotton*, 2 *Wall.* 404; *Coppell* v. *Hall*, 7 *Wall.* 542; *McKee* v. *United States*, 8 *Wall.* 163 ; *United States* v. *Grossmayer*, 9 *Wall.* 72.

In the second case cited, 2 *Wall.* 419, the court said : " It is said, that though remaining in rebel territory, Mrs. Alexander has no sympathy with the rebel cause, and that her property, therefore, cannot be regarded as enemy property ; but this court cannot inquire into the personal character and dispositions of the individual inhabitant of enemy territory. We must be governed by the principle of public law so often announced from the bench, as applicable alike to civil and international wars, that all the people of each state or district in insurrection against the United States must be regarded as enemies, until by the action of the legislature and the

executive, or otherwise, that relation is thoroughly and permanently changed.   But if it be conceded that the late war was a mere insurrection, and that the impossibility of performance arose from the special interdict of the government merely, the case is not changed.   It will still be governed by the same rules.   The same question will still exist, to be answered by the application of the same principles."

In *Hadley* v. *Clarke*, 8 *T. R.* 259, an embargo of the British government was held not to absolve the defendants from an obligation to carry the plaintiff's goods from Liverpool to Leghorn, although it lasted two years.   Lawrence, J., said : " This is certainly a case of hardship on the defendants, but I do not see any legal grounds on which they can be excused paying the damages which the plaintiff has suffered in consequence of their not having performed their engagement."   The counsel for the defendants were driven to the necessity of introducing into this contract other terms than those which it contains ; they contended that the defendants were only bound to fulfil their engagement within a reasonable time, and then argued that as the embargo prevented the completion of the contract within a reasonable time, the defendants were absolved from their engagement altogether.   But it was incumbent on the defendants when they entered into this contract, to specify the terms and conditions on which they would engage to carry the plaintiff's goods to Leghorn ; they accordingly did express the terms and absolutely engaged to carry the goods, " the dangers of the seas only excepted ; " that, therefore, is the only excuse they can make for not performing the contract ; if they had intended that they should be excused for any other cause, they should have introduced such an exception into their contract.   In *Paradine* v. *Jane*, *Aleyn* 26, this distinction is taken : " Where the law creates a duty or charge and the party is disabled to perform it without any default in him and hath no remedy over these, the law will excuse him ; but when the party, by his own contract, creates a duty or charge upon himself, he is bound to make it good if he may, notwith-

standing any accident by inevitable necessity, because he might have provided against it by his contract." So, in this case there was one accident against which the defendants provided by their contract; they might have also provided against the embargo. But we cannot vary the terms of the contract, and the defendants must be bound by the terms of the contract they have made. To the same effect is *Brown* v. *The Royal Insurance Society*, 5 *Jur. N. S.* 1255, where a fire insurance company after a loss had elected to reinstate the premises in preference to paying the claims, and while they were proceeding to reinstate them, the commissioners of sewers caused them to be taken down as a structure in a dangerous condition, but such condition was not caused by the fire; it was held that a plea showing performance to be impossible was no answer to a suit against the company for damages for the loss. It will be observed that these were cases of covenants and not of conditions.

It is not to be forgotten that the company has rights under their contract and as to the construction to be placed upon it, which the court is bound to respect. In the language of Lord Kenyon, in *Campbell* v. *French*, 6 *T. R.* 212, " the plaintiff in error, who entered into the contract imposing these terms upon his contract and subscribing it with that limitation and that condition, had a right to impose those terms; and if any person tell him that he acceded to either terms, he has a right to answer, ' this is not my contract; *non hæc in fœdera veni ;* do not impose on me other conditions than those I have imposed upon myself by the contract I have entered into.' If this case had been foreseen perhaps the condition would have been adapted to the case, but we are now construing a strict legal instrument to which legal effect may be given." If it be said that the view I have taken of this subject, will inflict hardship on the assured by subjecting him to the loss of the premiums he may have paid before the war broke out, the answer is, that the hardship is attributable to the contract he made and to the effect of war upon it, and it may be added, that as to the hardships which have arisen from the state of

hostility between the federal government and the section of country in revolt, it is just that they should fall rather on the inhabitants of the latter than on loyal people.   As was said by the court in the case of *The Rapid*, 8 *Cranch* 155, 164, in affirming a decree of condemnation against the goods of an American citizen which were owned by him when the war broke out, and were then in the enemy's country, and which had been taken by a privateer while they were being transported hither during the war in an American vessel employed by him for that purpose alone, " it is the unenvied province of this court to be directed by the head and not the heart.   In deciding upon principles that must define the rights and duties of the citizen, and direct the future decisions of justice, no latitude is left for the exercise of feeling."

For the reasons I have given, I am of opinion that the judgment of the Supreme Court should be reversed.

*For affirmance*—BEDLE, DALRIMPLE, DEPUE, CLEMENT, GREEN, LILLY, WALES.   7.

*For reversal*—The CHANCELLOR, WOODHULL.   2.